**PUBLIC COPY--MATERIAL SUBJECT TO PENDING MOTION TO SEAL DELETED**

**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 14-7144**

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ANGELENE HARDAWAY and LENA HARDAWAY,

*Plaintiffs-Appellants,*

v.

DISTRICT OF COLUMBIA HOUSING AUTHORITY,

*Defendant-Appellee.*

---

On Appeal from the United States District Court for the District of Columbia
No. 1:13-cv-01232-RJL (Leon, J.)

---

**OPENING BRIEF OF COURT-APPOINTED *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

---

DINA B. MISHRA
*Counsel of Record and
Court-Appointed Amicus Curiae
in Support of Plaintiffs-Appellants*

STEVEN H. GOLDBLATT, Director
SARAH MCDONOUGH, Student Counsel

GEORGETOWN UNIVERSITY LAW CENTER
APPELLATE LITIGATION PROGRAM
111 F Street NW, Suite 306
Washington, DC 20001
Tel:  202-662-9788

May 20, 2016

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Court-Appointed *Amicus Curiae* states as follows:

### A.   Parties and *Amicus Curiae*

The parties to this appeal and in the proceedings before the district court are Plaintiffs-Appellants Angelene Hardaway and Lena Hardaway ("the Hardaways") and Defendant-Appellee District of Columbia Housing Authority ("DCHA").

This Court appointed Dina B. Mishra, a member of the bar of this Court and a Law Research Fellow at Georgetown University Law Center, as *amicus curiae* ("Amicus") to present arguments in support of Plaintiffs-Appellants upon this appeal only.  In that capacity, Ms. Mishra is working within the Georgetown University Law Center Appellate Litigation Program, including with Professor Steven H. Goldblatt, that Program's Director, and with Sarah McDonough, a law student enrolled in that Program's Appellate Litigation Clinic.

### B.   Rulings Under Review

The Hardaways appeal a July 30, 2014 order, entered by Judge Richard J. Leon of the United States District Court for the District of Columbia, that dismissed this case with prejudice.  Joint Appendix ("JA") 53.  The district court's opinion is published at *Hardaway v. D.C. Housing Authority*, 61 F. Supp. 3d 115 (D.D.C. 2014).  The Hardaways also appeal the district court's order docketed on

September 5, 2013 that denied their Motion To File Complaint Under Seal. JA26-27.

## C.    Related Cases

**1.**   On September 5, 2013, the district court docketed an order denying the Hardaways' Motion To File Complaint Under Seal. JA26-27. The Hardaways filed a Notice of Interlocutory Appeal on September 6, 2013 (No. 13-7138). JA28-29. This Court dismissed that interlocutory appeal for lack of appellate jurisdiction on the ground that the order was neither final nor an appealable collateral order. D.C. Cir. No. 13-7138 Item #1502003. The district court's denial of the Motion To File Complaint Under Seal is an issue raised on this appeal.

**2.**   The U.S. District Court for the District of Columbia received on July 18, 2014, and docketed on July 24, 2014, a complaint filed by the Hardaways against the District of Columbia and its Chief of Police and Mayor (No. 1:14-cv-01273). D.D.C. Case No. 1:14-cv-01273 Docket Entry #1. The complaint alleged that a D.C. police officer failed to enforce the Hardaways' rights as tenants against a July 18, 2013 attempted eviction by Angelene's leasing agent. *Id.* On August 31, 2015, an order and an opinion by Judge Leon were docketed that dismissed that case; the opinion denied the defendants' motion to dismiss for lack of standing but granted their motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Hardaway v. District of Columbia*, No. 1:14-cv-01273, 2015

WL 5138711 (D.D.C. Aug. 31, 2015).  The Hardaways appealed (No. 15-7095).

On January 4, 2016, this Court granted the defendants' motion for summary

affirmance.  *Hardaway v. District of Columbia*, No. 15-7095, 2016 WL 232009

(D.C. Cir. Jan. 4, 2016).

    **3.**  On May 7, 2013, two other individual plaintiffs and an organization filed

a complaint in the United States District Court for the District of Columbia that

raised claims that DCHA violated the Fair Housing Act, Americans with

Disabilities Act, and Rehabilitation Act by failing to make its program accessible

to people with disabilities (No. 1:13-cv-00652).  Those claims are similar to some

of the claims advanced here.  The district court in that case, in an opinion by Judge

Colleen Kollar-Kotelly, denied DCHA's motion to dismiss, concluding that the

plaintiff organization had standing and had adequately pleaded its claims and that

the individual plaintiffs' claims were not moot.  *Young v. D.C. Housing Authority*,

31 F. Supp. 3d 90 (D.D.C. 2014).  The parties settled and dismissed that case for

(among other relief) $350,000 in compensatory damages, attorneys' fees, and

costs.  Settlement Order and Attached Stipulation of Settlement, ¶8, *Young*, No.

1:13-cv-652 (D.D.C. Feb. 28, 2015) (*Young* District Court Docket Entries #43 and

#43-1).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES.......................................................................vi

GLOSSARY OF ABBREVIATIONS........................................................ xii

STATEMENT OF JURISDICTION ..............................................................1

STATEMENT OF ISSUES ...........................................................................1

STATUTES AND REGULATIONS ..............................................................2

STATEMENT OF THE CASE ......................................................................2

A.   Statutory And Regulatory Background .........................................2

     1.   Housing Choice Voucher Program.........................................2

     2.   Fair Housing Act ....................................................................5

     3.   Americans with Disabilities Act and Rehabilitation Act .......5

B.   Statement Of Facts And Procedural History .......................................7

     1.   Initial Live-In Aide Approval And Two-Bedroom Voucher Issuance ....8

     2.   DCHA's Denials Of All Reasonable Accommodations Requests ...........8

     3.   Complaint And Emergency Motions Filings.........................10

     4.   Subsequent Housing-Related Developments ........................12

     5.   District Court Proceedings, Interlocutory Appeal, And Original Briefing In This Appeal ......13

STANDARD OF REVIEW...........................................................................18

SUMMARY OF ARGUMENT...................................................................18

ARGUMENT ..............................................................................................20

I.   THE HARDAWAYS' INJURIES ESTABLISH ARTICLE III STANDING ........................20

    A. DCHA's Denials Of The Requested Housing Voucher And Of Housing Access Caused Article III Injury..........................................22

      1.   DCHA's two-bedroom voucher rescission establishes standing...24

      2.   DCHA's denial of a voucher based on the D.C. payment standard establishes standing ..............................................34

      3.   DCHA's interference with housing access establishes standing...36

B. DCHA's Denial Of Live-In Aide Approval Inflicted Article III Injury ...................................................................................39

C. DCHA Inflicted Procedural Injuries That Support Standing .................43

D. DCHA's Federal Statutory Rights Deprivations Are Article III Injuries .....................................................................................45

E. The Hardaways Were At Least Entitled To Jurisdictional Discovery ....................................................................................47

II.  THE HARDAWAYS' CLAIMS WERE NOT MOOT................................................48

III.  THE DISTRICT COURT ERRED BY DISMISSING THE CASE *WITH PREJUDICE* .......54

IV.  PREJUDICE FROM THE SEALING MOTION DENIAL REQUIRES BOTH ITS REVERSAL AND REVERSAL OF THE CASE'S DISMISSAL ................................56

CONCLUSION ...............................................................................................60

REQUEST FOR ORAL ARGUMENT................................................................61

CERTIFICATE OF COMPLIANCE ...................................................................62

CERTIFICATE OF SERVICE...........................................................................63

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524
(D.C. Cir. 2015) ........................................................................22, 48, 49

*Adarand Constr., Inc. v. Slater*, 528 U.S. 216, 222 (2000) ....................49

*Allen v. Wright*, 468 U.S. 737 (1984) .....................................................39

*Alvarez v. Smith*, 558 U.S. 87 (2009) .....................................................54

*Am. Bar Ass'n v. Fed. Trade Comm'n*, 636 F.3d 641 (D.C. Cir. 2011) .................49

*Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137 (D.C. Cir. 2011)* ...........................................21, 23, 30, 38, 48, 49

*Ams. for Safe Access v. DEA*, 706 F.3d 438 (D.C. Cir. 2013)................25

*Andrx Pharm., Inc. v. Biovail Corp., Int'l*, 256 F.3d 799 (D.C. Cir. 2001) ............55

*Babbitt v. United Farm Workers*, 442 U.S. 289 (1979) .........................26

*Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161 (D.C. Cir. 2004) ........................................................................................6

*Brew-Parrish v. Bd. of Trustees of S. Ill. Univ.*, 78 F.3d 320 (7th Cir. 1996)..........6

*Brown v. Whole Foods Mkt. Grp, Inc.*, 789 F.3d 146 (D.C. Cir. 2015) ............22, 29

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001) ........................................................................54

*City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181 (D.C. Cir. 2007) ......................44

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013)...................................27, 38

*Cnty. of L.A. v. Davis*, 440 U.S. 625 (1979)...............................................49

*Coll v. First Am. Title Co.*, 642 F.3d 876 (10th Cir. 2011) .....................................55

*Columbia Basin Apartment Ass'n v. City of Paco*, 268 F.3d 791 (9th Cir. 2001) ........................................................................................38

*EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406 (D.C. Cir. 1996)...............18, 59

*Erickson v. Pardus*, 551 U.S. 89 (2007)*..............................................21, 23, 30, 38

*Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136 (D.C. Cir. 2011).................31

*Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268 (D.C. Cir. 1994) ........................................................................32

*Fanning v. Capco Contractors, Inc.*, 711 F. Supp. 2d 65 (D.D.C. 2010) ...28, 37, 49

*Flynt v. Weinberger*, 762 F.2d 134 (D.C. Cir. 1985) ............................................55

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015) ..................32

*Friends of the Earth, Inc v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)....................................................................................................49, 55

*Fulton v. Goord*, 591 F.3d 37 (2d Cir. 2009) ...........................................................46

*Fund for Animals, Inc. v. Norton*, 322 F.3d 728 (D.C. Cir. 2003) ........................24

*Gray v. Greyhound Lines, E.*, 545 F.2d 169 (D.C. Cir. 1976) ...............................39

*Hardaway v. District of Columbia*, No. 1:14-cv-01273, 2015 WL 5138711 (D.D.C. Aug. 31, 2015)................................................................ iii, 13, 28

*Hardaway v. District of Columbia*, No. 15-7095, 2016 WL 232009 (D.C. Cir. Jan. 4, 2016)............................................................................. iii

*Hardaway v. D.C. Housing Authority*, 61 F. Supp. 3d 115 (D.D.C. 2014).............. i

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)...................................31, 45

*Heckler v. Mathews*, 465 U.S. 728 (1984) ..............................................................39

*Huron v. Cobert*, 809 F.3d 1274 (D.C. Cir. 2016) .................................................44

*I.A.M. Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 24 (D.C. Cir. 1986) ..........................................................................................56

*In re Idaho Conservation League*, 811 F.3d 502 (D.C. Cir. 2016) ..................27, 38

*In re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008) .........................................39

*In re Sealed Case (Medical Records)*, 381 F.3d 1205 (D.C. Cir. 2004) ................60

*Kasap v. Folger Nolan Fleming & Douglas, Inc.*, 166 F.3d 1243 (D.C. Cir. 1999) .........................................................................................................55

*Kifafi v. Hilton Hotels Retirement Plan*, 701 F.3d 718 (D.C. Cir. 2012)...............49

*LaRoque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011)................................................18

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973).......................................................45

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)*...................................21, 24, 30, 34, 38, 44, 45, 46

*Monroe Energy, LLC v. EPA*, 750 F.3d 909 (D.C. Cir. 2014) ...............................25

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ...............................27

*Moore v. Agency for Int'l Dev.*, 994 F.2d 874 (D.C. Cir. 1993) ............................29

*Myers v. Knight Protective Serv.*, 774 F.3d 1246 (10th Cir. 2014)........................60

*Natural Res. Def. Council v. Pena*, 147 F.3d 1012 (D.C. Cir. 1998)....................48

*Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (2011)..........................................59

*Nozzi v. Hous. Auth. of L.A.*, 806 F.3d 1178 (9th Cir. 2015)................................25

*Obama v. Klayman*, 800 F.3d 559 (D.C. Cir. 2015)...............................................47

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007)......................................................................................................................54

*Pegram v. Herdrich*, 530 U.S. 211 (2000). .....................................................29, 38

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087 (D.C. Cir. 2015) ................................................................................32

*Primas v. District of Columbia*, 719 F.3d 693 (D.C. Cir. 2013) ...........................59

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279 (D.C. Cir. 2007) .............................................................................................38

*Rainbow/PUSH Coalition v. FCC*, 396 F.3d 1235 (D.C. Cir. 2005) .....................32

*Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300 (4th Cir. 1992) .................26

*Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137 (D.C. Cir. 2008) ..........................................................................................................1

*Schmidt v. United States*, 749 F.3d 1064 (D.C. Cir. 2014) ....................................18

*Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039 (D.C. Cir. 2010) ...............................45

*Sheely v. MRI Radiology Network*, 505 F.3d 1173 (11th Cir. 2007).......................6

*Spann v. Colonial Vill.*, 899 F.2d 24 (D.C. Cir. 1990) ..........................................31

*Spokeo, Inc. v. Robins*, No. 13-1339, 2016 WL 2842447 (U.S. May 16, 2016) .................................................................................................................46

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)..............................................44

*Thompson v. Washington*, 497 F.2d 626 (D.C. Cir. 1973) .....................................26

*Toolasprashad v. Bur. of Prisons*, 286 F.3d 576 (D.C. Cir. 2002)* .....21, 23, 30, 38

*United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1981).....................................59

*Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601 (D.C. Cir. 1987)........28, 37, 49

*Warth v. Seldin*, 422 U.S. 490 (1975)..............................................................45, 46

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013)............................44

*Women's Equity Action League v. Cavazos*, 879 F.2d 880 (D.C. Cir. 1989)..........39

*Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994) ...............26

*Young v. D.C. Housing Authority*, 31 F. Supp. 3d 90 (D.D.C. 2014) ............... iii, 50

*Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 444 F.3d 614 (D.C. Cir. 2006) .......45

## STATUTES

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1343 ...............................................................................................1

29 U.S.C. § 794 .............................................................................................1, 5

29 U.S.C. § 794a ...............................................................................................6

42 U.S.C. § 1437f* ................................................................................2, 3, 4, 36

42 U.S.C. § 2000d *et seq.* ..................................................................................6

42 U.S.C. § 2000e-5 ...........................................................................................6

42 U.S.C. § 3604 ............................................................................................1, 5

42 U.S.C. § 3613 ...............................................................................................5

42 U.S.C. § 12132 ..........................................................................................1, 5

42 U.S.C. § 12133 ..............................................................................................6

D.C. Code § 6-202.............................................................................................3

## REGULATIONS

24 C.F.R. § 5.403...............................................................................................3

24 C.F.R. § 5.628.............................................................................................36

24 C.F.R. pt. 982 ...............................................................................................2

24 C.F.R. § 982 .................................................................................................3

24 C.F.R. § 982.1*......................................................................................2, 3, 4

24 C.F.R. § 982.201...........................................................................................3

24 C.F.R. § 982.305...........................................................................................4

24 C.F.R. § 982.316...........................................................................................3

24 C.F.R. § 982.352...................................................................................4

24 C.F.R. § 982.353...................................................................................4

24 C.F.R. § 982.355*.................................................................4, 5, 33, 35

24 C.F.R. § 982.401...................................................................................3

24 C.F.R. § 982.402...............................................................................3, 40

24 C.F.R. § 982.503...................................................................................4

24 C.F.R. § 985.505...............................................................................4, 36

24 C.F.R. § 985.514...................................................................................4

24 C.F.R. § 985.515...............................................................................4, 36

24 C.F.R. § 982.551...............................................................................4, 41

77 Fed. Reg. 61,158 (Oct. 5, 2012). ...........................................................35

D.C. Mun. Regs. tit. 14, § 4900..................................................................3

D.C. Mun. Regs. tit. 14, § 5205...............................................................3, 40

D.C. Mun. Regs. tit. 14, § 5206.................................................................40

D.C. Mun. Regs. tit. 14, § 5317.................................................................40

D.C. Mun. Regs. tit. 14, § 8300 (2013) .....................................................35

**RULES**

Fed. R. Civ. P. 15(a)(2) .............................................................................29

Fed. R. Civ. P. 15(d) .................................................................................29

Fed. R. App. P. 4(a)(1)(A).............................................................................1

Fed. R. App. P. 32(a)(5)(A).........................................................................62

Fed. R. App. P. 32(a)(6) .............................................................................62

Fed. R. App. P. 32(a)(7)(C) ........................................................................62

Fed. R. App. P. 32(a)(7)(C)(i) .....................................................................62

Fed. R. App. P. 32(a)(7)(B)(i) .....................................................................62

Fed. R. App. P. 32(a)(7)(B)(iii) ...................................................................62

D.C. Cir. R. 28(a)(1) ...................................................................................i

D.C. Cir. R. 28(c) .......................................................................................62

D.C. Cir. R. 32(e)(1)...................................................................................62

**MISCELLANEOUS**

Voucher Program Guidebook: Housing Choice (Apr. 2001)...................................35

_____

\* Authorities upon which Amicus chiefly relies are marked with asterisks.

## GLOSSARY OF ABBREVIATIONS

DCHA......................................................... District of Columbia Housing Authority

HOC.......... Housing Opportunities Commission of Montgomery County, Maryland

PHA ........................................................................................public housing agency

ADA .................................................................... Americans with Disabilities Act

HCVP ............................................................... Housing Choice Voucher Program

## STATEMENT OF JURISDICTION

Plaintiffs-Appellants Angelene & Lena Hardaway ("the Hardaways") sued Defendant-Appellee District of Columbia Housing Authority ("DCHA") for violations of the Fair Housing Act, 42 U.S.C. § 3604(f), the Americans with Disabilities Act, *id.* § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Joint Appendix ("JA") 5-16. The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343. The district court issued a final order dismissing the case with prejudice on July 30, 2014. JA53. The Hardaways' notice of appeal was timely filed on August 29, 2014. JA55; JA67; *see* Fed. R. App. P. 4(a)(1)(A).[1] This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

**1.** Whether the district court erred in dismissing this case for lack of standing where the Hardaways alleged injuries that included (a) denial of reasonable accommodations requests, including for approval of a live-in aide, for a two-bedroom housing voucher on the D.C. payment standard, and for procedural accommodations; (b) discrimination based on disability by interfering with the Hardaways' ability to obtain appropriate rental housing; and (c) injuries resulting therefrom, including denial of effective communication with Angelene; out-of-

---

[1] Although the notice of appeal was not docketed until September 17, 2014, JA54, the district court found it was timely received on August 29, 2014, JA66-67. Therefore, it was timely filed. *See, e.g.*, *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 139-143 (D.C. Cir. 2008).

pocket losses; unlawful deprivation of the Hardaways' federally statutorily protected rights; humiliation, frustration, and physical and emotional distress; and diversion of Lena's scarce resources to counteract these and other harms.

**2.** Whether the court erred in dismissing as moot the two-bedroom housing voucher claims.

**3.** Whether the court erred in dismissing the case *with prejudice*.

**4.** Whether the court erred in denying the Motion To File Complaint Under Seal.

## STATUTES AND REGULATIONS

An addendum containing relevant statutes and regulations appears at the end of this brief.

## STATEMENT OF THE CASE

**A.** **Statutory And Regulatory Background**

**1.** **Housing Choice Voucher Program**

The Housing Choice Voucher Program ("HCVP"), sometimes called the "Section 8 program," provides federal funding to assist low-income tenants in affording private rental housing.  42 U.S.C. § 1437f(a); 24 C.F.R. §§ 982.1(a), 982.201(a)-(b).  Its governing federal statute and regulations are codified at 42 U.S.C. § 1437f(o), (r) and 24 C.F.R. pt. 982.

The HCVP's rental subsidies, or vouchers, are administered by local housing authorities, also known as "public housing agencies" or "PHAs." 42 U.S.C.§ 1437f(a), (b)(1); 24 C.F.R. §§ 982.1(a)(1). Defendant-Appellee District of Columbia Housing Authority ("DCHA"), "an independent authority of the District government," administers the HCVP in the District of Columbia. D.C. Code § 6-202(a), (b); D.C. Mun. Regs. tit. 14, § 4900. The Housing Opportunities Commission of Montgomery County, Maryland ("HOC") administers the HCVP in that county.

When a family (which may be a single individual, 24 C.F.R. § 5.403) is selected for HCVP participation, the relevant PHA issues a voucher for a particular unit size. *Id.* § 982.402(a)(3). Various factors determine the unit size, including whether a live-in aide has been approved to reside with the family to care for a disabled person. *Id.* § 982.402(b)(6)-(7); D.C. Mun. Regs. tit. 14, §§ 5205.2(e), (g), 5205.3(e). The PHA must approve a live-in aide if needed as a reasonable accommodation to make the program accessible to a disabled person. *Id.* § 982.316(a).

After a voucher for a specific unit size issues, the HCVP tenant chooses a private rental unit in the locality and the relevant PHA approves it after inspection subject to various requirements. 24 C.F.R. §§ 982.305, 982.352, 982.401. The PHA then pays the voucher subsidy directly to the unit owner pursuant to a

3

contract, and the tenant pays her rental contribution directly to the unit owner pursuant to her lease and other requirements. *Id.* §§ 982.1, 982.451, 982.514-.515, 982.551.

The voucher's unit size affects its subsidy amount. *Id.* §§ 982.503(a)(1)-(2), 982.505(a)-(b). That subsidy is determined by reference to a local "payment standard," which reflects the cost to rent a unit of that size in the local housing market. *Id.* § 982.1(a)(3). The PHA determines the locality's payment standards within certain limits. 42 U.S.C. § 1437f(o)(1)(B); 24 C.F.R. §§ 982.503(a)(1), (b)(1)-(2).

The HCVP requires voucher "portability," through which the tenant family may use their voucher to rent an eligible unit wherever the HCVP is administered. 42 U.S.C. § 1437f(r)(1)(A); 24 C.F.R. § 982.353(b). The receiving PHA for the rental area (here, DCHA) must administer the portable voucher, and will either absorb the voucher into its own program or bill the initial PHA (here, Montgomery County's HOC) for the voucher subsidy. 24 C.F.R. § 982.355(a)-(e). Under either billing or absorption, the receiving PHA must determine the voucher's unit size based on the receiving PHA's subsidy standards, and the portable family's subsidy amount "is determined in the same manner as for other families in the receiving PHA program." *Id.* § 982.355(c)(12), (e)(2).

4

### 2.    Fair Housing Act

The Fair Housing Act prohibits discrimination based on a renter's disability in rental housing, in the "terms, conditions, or privileges" of rental housing, or in the provision of services or facilities in connection with rental housing.  42 U.S.C. § 3604(f)(1)-(2).  The prohibited discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodation may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  *Id.* § 3604(f)(3)(B).  "[A]ggrieved person[s]" may sue for damages (actual and punitive), injunctive relief, and reasonable attorney's fees. *Id.* § 3613(a)(1)(A), (c).

### 3.    Americans with Disabilities Act and Rehabilitation Act

The Americans with Disabilities Act ("ADA") prohibits a public entity from discriminating against a qualified individual with a disability, and prohibits excluding such an individual from participation in, or denying her the benefits of, the services, programs, or activities of a public entity.  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act similarly declares that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

5

An "aggrieved" person may sue under the ADA or Rehabilitation Act

Section 504 for injunctive relief, compensatory damages, and reasonable attorney's

fees.  42 U.S.C. § 12133 (ADA remedies provision, adopting the remedies of 29

U.S.C. § 794a); 29 U.S.C. § 794a(a)(2), (b) (Rehabilitation Act remedies provision,

providing for "a reasonable attorney's fee as part of the costs" and adopting the

remedies of Title VI and Section 706(e)(3) of the Civil Rights Act of 1964 (the

latter as "applied to claims of discrimination in compensation"), which are codified

at 42 U.S.C. 2000d *et seq.* and 42 U.S.C. § 2000e-5); *see, e.g.*, *Barbour v. Wash.*

*Metro. Area Transit Auth.*, 374 F.3d 1161, 1162 (D.C. Cir. 2004) (allowing a

Rehabilitation Act Section 504 suit for damages to proceed as not barred by

sovereign immunity); *Sheely v. MRI Radiology Network*, 505 F.3d 1173, 1190-

1198 (11th Cir. 2007) (describing Supreme Court precedent as establishing

compensatory-damages availability, such as for emotional distress, under

Rehabilitation Act Section 504); *Brew-Parrish v. Bd. of Trustees of S. Ill. Univ.*, 78

F.3d 320, 322 (7th Cir. 1996) (stating that "numerous Circuit Courts of Appeals

have interpreted [Rehabilitation Act] § 504 to independently allow compensatory

damages," and citing Third, Fourth, Sixth, Eighth, and Eleventh Circuit decisions).

MATERIAL UNDER SEAL DELETED

**B.    Statement Of Facts And Procedural History**

Except as otherwise indicated, the following facts are as alleged in the Hardaways' complaint.  JA5-16.  The procedural history is drawn from various other filings, orders, and opinions.

Angelene Hardaway is a person with disabilities within the ADA's meaning,

███████████████████████████████████████████████ JA6-7 ¶¶9, 13

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

Prior to DCHA's challenged conduct, Lena Hardaway was Angelene's live-in aide approved by the Housing Opportunities Commission of Montgomery County, Maryland ("HOC").    JA6-7  ¶¶10, 13.  ██████████████████

████████████████████████████████████████████████████

██████████████████████    Lena is also Angelene's Social Security Administration payee.  JA6 ¶10.

### 1.  Initial Live-In Aide Approval And Two-Bedroom Voucher Issuance

On February 22, 2013, the local housing authority in Montgomery County, Maryland, known as HOC, approved Angelene's request to have Lena as a live-in aide.  JA7 ¶13.  HOC issued Angelene a two-bedroom voucher on March 21, 2013. *Id.*

Angelene sought to move into D.C., consistent with HCVP portability.  In seeking a housing voucher from DCHA to live in D.C., Angelene made "reasonable accommodation" requests to DCHA on May 8, 2013 and June 6, 2013, JA7 ¶13, which the district court understood "as a request for both a live-in aide and a voucher for a two-bedroom apartment," JA49.  As part of those requests, Angelene asked "to have [DCHA] contact Lena Hardaway and to have meeting[s] by phone."  JA7 ¶13.  DCHA did not do so.  JA6-8 ¶¶12-13.

DCHA issued a two-bedroom housing voucher to Angelene on June 6, 2013. JA7 ¶13.  The Hardaways found a rental unit (3232 Georgia Avenue NW, Apt. 605, Washington DC 20010); DCHA approved it by June 25, 2013; and the Hardaways moved in by June 27, 2013.  *Id.*

### 2.  DCHA's Denials Of All Reasonable Accommodations Requests

After the Hardaways moved into their new home, DCHA and its agents, Ms. Sherry Smith and Ms. Nicole Brooks, undertook a series of injurious actions challenged here.  JA6-8 ¶¶12-13.

8

**MATERIAL UNDER SEAL DELETED**

DCHA "refuse[d] all reasonable accommodations request[s]" for Angelene. JA6 ¶12. As noted above, those requests were for both live-in aide approval and a two-bedroom housing voucher administered by DCHA in D.C., JA49, and for procedural accommodations to facilitate communication between DCHA and Angelene. JA7-8 ¶13.

Among other refusals of those requests, Ms. Smith mailed a "denial of participant request for reasonable accommodation" letter on July 9, 2013 that was "misleadingly backdated" to June 28, 2013. JA7 ¶13; *see* JA19 (motion for emergency temporary injunction) (alleging that DCHA waited until just after the Hardaways moved in on June 27, 2013 to "take back [the] 2 unit voucher"). That July 2013 "denial letter" was addressed to Angelene, not Lena, ███████████ ████████████████████████████████ despite the earlier requests to Ms. Smith for phone meetings and contact with Lena. JA7 ¶13. The letter also stated that Angelene could only appeal DCHA's decisions by filing a complaint in person with DCHA, ████████████████████████████████████ ████████████████████. *Id.*

DCHA's agent Ms. Brooks also refused to accept a "Health Provider's Verification of a Need for a [R]easonable Accommodation in [H]ousing" form completed by Angelene's doctor (and dated February 21, 2013) because it was an

HOC, not DCHA, form addressed to someone at HOC.  JA6-8 ¶¶12-14; JA17-18 (Angelene's doctor's report).

Although Lena, for Angelene, repeatedly attempted to contact Ms. Smith at DCHA about the refused accommodations, her attempts were generally ignored or rejected.  JA7 ¶13.

### 3.    Complaint And Emergency Motions Filings

According to the Hardaways' original opening brief in this appeal ("Orig. Opening Br."), they filed their *pro se* complaint against the DCHA on July 11, 2013, using the district court's drop box just after the court closed. Orig. Opening Br. 5, 37 (stating that the court stamped their complaint as received at 4:05PM, and reproducing photocopied first page of the time-stamped complaint).  That brief says that the Hardaways included with their complaint two motions: one for an emergency temporary injunction and one to file the complaint under seal.  *Id.* at 25-26, 31-32.  The district court clerk's office, however, did not docket any of those filings that month, even though the Hardaways' original opening brief says that on July 15, 2013, Lena confirmed with two different people there that the office had received all three.  *Id.* at 6, 25-26.

On August 9, 2013, the district court finally docketed versions of the complaint and emergency temporary injunction motion that were stamped as

10

received on July 12, 2013. JA5; JA19; *see also* JA50 & n.2 (district court's opinion, referring to complaint as filed on July 12, 2013).

The complaint claims that DCHA violated the Fair Housing Act, the ADA, and Rehabilitation Act Section 504 by "discriminating against Angelene ... and refus[ing] all reasonable accommodations request[s]," including requests for a live-in aide, for a two-bedroom housing voucher to live in D.C., and for procedural accommodations. JA6-8 ¶¶12-13. The complaint alleges that the Hardaways, beyond suffering "discrimination" and denial of access to DCHA's programs and services including effective communication with DCHA, "have suffered and continue to suffer irreparable loss and injury, including but not limited to, humiliation, frustration, embarrassment, emotional distress, out-of-pocket losses, interference with their ability to obtain housing appropriate to their needs, and unlawful deprivation of their federally protected rights," as well as "attorney fees," "physical and emotional distress," and "frustration of mission, and diversion of resources." JA6-15 ¶¶12-14, 17, 23-25, 29, 34, 36-37, 45-46, 48-50, 54, 58, 60-62, 66-67, 68(c). The Hardaways sought damages, injunctive relief, and attorney's fees. JA7 ¶13; JA15-16 ¶68.

In their emergency temporary injunction motion, the Hardaways further complained of DCHA's two-bedroom voucher rescission and its consequences. JA19 (alleging DCHA's discriminatory decisions "to take back [the] 2 unit

11

voucher and now forc[e] Angelene to find a new apartment" and "forc[e] Angelene into a[] one unit voucher").

The district court never docketed the motion to file the complaint under seal that the Hardaways say they filed on July 11, 2013. JA23; Orig. Opening Br. 25-26, 31-32. The Hardaways therefore filed a second such motion, which was docketed on August 29, 2013. JA23. In that Motion To File Complaint Under Seal ("sealing motion"), they requested an order directing that the complaint, all medical records, and all non-dispositive materials be filed under seal, reasoning that exposure of records and information about Angelene's medical disorder could harm her employment prospects and embarrass her. JA23-24.

### 4.    Subsequent Housing-Related Developments

After the case-opening documents were received but before they were docketed, the Hardaways continued to suffer "interference with their ability to obtain [appropriate] housing," JA8 ¶14, according to a complaint they filed before the same district judge in a related case against other defendants. *See* Complaint, *Hardaway v. District of Columbia*, No. 1:14-cv-01273 (July 24, 2014), *in* Addendum to Appellee's Brief ("Add.") 24-32, D.C. Cir. Item #1554158. The district court received that related complaint on July 18, 2014 and docketed it on July 24, 2014, a week before the court decided to dismiss this case. *Id.*; JA53.

That related complaint alleges that on July 18, 2013, after Angelene had moved into the apartment, her "leasing agent was illegally, negligently, forcibly trying to evict" the Hardaways, trying to force Angelene to sign a contract without her lawyer or aide reviewing it, and "physically blocking [the Hardaways'] access to the apartment, and the loading dock." Add.025-026, ¶8. Overall, that complaint alleges, "the leasing agent was forcibly attacking [the Hardaways] and refusing to allow them access to the apartment." Add.026, ¶9. Therefore, it alleges, Lena called 911 and a D.C. police officer refused to enforce their tenant rights against the attempted eviction. Add.026-027, ¶¶8-11. They sued on civil rights claims and under the ADA based on that officer's failures, naming as defendants the District of Columbia and its Mayor and Chief of Police. Add.024, Add.027-030. The district court in that case found that they had standing, but failed to state a claim. *Hardaway v. District of Columbia*, No. 1:14-cv-01273, 2015 WL 5138711, at *1-5 (D.D.C. Aug. 31, 2015).

**5.  District Court Proceedings, Interlocutory Appeal, And Original Briefing In This Appeal**

The district court denied the Hardaways' emergency temporary injunction motion in an order dated July 20, 2013 but not docketed until August 9, 2013. JA21-22. The court concluded that the Hardaways had neither shown that they would suffer immediate injury before DCHA could be heard in opposition, nor indicated their efforts to notify DCHA. *Id.*

13

The court also denied the Hardaways' sealing motion in an order docketed on September 5, 2013.  JA26-27.  Notwithstanding Angelene's medical report and other medical information in the Hardaways' case-opening filings, *e.g.* JA6-8; JA17-18; JA19-20, the court declared that none of the documents filed to date was a medical record.  JA27 n.1.  The court stated that Angelene's having a disability is "a critical fact" for the Hardaways to allege and prove to prevail; that "[i]t alone is not information so sensitive" as to justify sealing the case documents; and that the parties could seek to redact or seek a protective order as to any medical records or sensitive documents that might be introduced later.  JA27 & n.1.  The Hardaways filed a Notice of Interlocutory Appeal from that order, JA28-29, which this Court dismissed for lack of appellate jurisdiction due to lack of a final or an appealable collateral order, D.C. Cir. No. 13-7138 Item #1502003.

DCHA filed a Motion To Dismiss Or, In The Alternative, For Summary Judgment on October 21, 2013.  JA30-31 [hereinafter DCHA's motion to dismiss].  DCHA's memorandum supporting that motion argued only that the Hardaways had failed to state a claim and that their case had become moot.  JA32-37.  On mootness, DCHA's memorandum invoked two documents: a September 26, 2013 "Denial of Participant Request for Reasonable Accommodation" letter issued by Ms. Smith as DCHA's Interim ADA/504 Coordinator [hereinafter "September

MATERIAL UNDER SEAL DELETED

2013 letter"], JA41; and an October 18, 2013 "Tenant Profile" [hereinafter "tenant profile"], JA42-43. JA35-36.

The September 2013 letter asserts that no documentation was submitted with Angelene's requests ███████████████████████████████████

████████████████████████████████████████████████████

████████    JA41.    (The Hardaways' complaint, to the contrary, alleges that Angelene submitted, but DCHA refused to accept, her doctor's report; ████████

████████████████████████████████████████████████████

███████████████████████████████████    JA6-8 ¶¶12, 14; JA18.)

The September 2013 letter also expressly declares, "[Y]our request for a live-in aide has been **denied**." JA41. Nevertheless, DCHA contended that its supplied documents—including the tenant profile, which lists an "L" in the relationship field for Lena, which DCHA said means "live-in aide"—indicate that DCHA had allowed Lena to live with Angelene in a two-bedroom apartment as her live-in aide. JA35-36.

The Hardaways opposed the dismissal motion, arguing that DCHA caused them "financial and emotional harm" and that the case was not moot even if "[DCHA] finally applied a temporary bandage to the problem" because DCHA had not "solve[d] the problem [it] created." JA44-47.

15

The district court issued an order and opinion on July 30, 2014, dismissing the case with prejudice.  JA48-53.  Although DCHA had not argued lack of Article III standing, JA30; JA32-37, the court relied on that ground due to a purported lack of injury traceable to the denials of live-in aide approval and procedural accommodations, JA51-52.  The court reasoned that "[n]otwithstanding the DCHA's decision to deny Angelene's request for a live-in aide, it acted in accordance with the HOC's decision to provide a voucher for a two-bedroom unit." *Id.*  In so doing, the court omitted any mention of the summer 2013 denials, including the July 2013 denial letter, and of their impact on the two-bedroom voucher, and instead implied that the September 2013 letter was the only "denial letter" and that it did not rescind that voucher.  JA49-50; JA51-52.  On the premise that the Hardaways retained full access to their requested two-bedroom voucher and that no related injury occurred, the court also found moot the Hardaways' claims "regarding their request for a voucher for a two-bedroom unit."  JA52 n.3.

This appeal followed.  In the original briefing, the Hardaways argued that the district court erred in dismissing their case, in failing to permit them to amend this case's complaint, and in denying their sealing motion.

The Hardaways' original opening brief also further details DCHA's denials of Angelene's reasonable accommodations requests that were alleged in the Hardaways' complaints and their emergency temporary injunction motion,

16

clarifying how DCHA's actions denied housing access to the Hardaways. For example, that brief (at 5) states that on July 11, 2013, the Hardaways went to DCHA's office in person to appeal the July 9, 2013 denial letter, and DCHA's Ms. Smith informed them that they must move out immediately. The brief (at 4, 6-7) also further describes the attempted eviction by Angelene's leasing agent that the Hardaways' related complaint alleges, including the following details: that DCHA, through its agents, Ms. Brooks and Ms. Smith, directed that attempted eviction; that Ms. Brooks told the Hardaways on July 15, 2013 that they were not allowed to access their apartment; and that these actions prompted the Hardaways to contact and, on July 16, 2013, hire an attorney, who advised them not to allow DCHA to force them out of the apartment. Consequently, the brief explains (at 7), the Hardaways suffered out-of-pocket losses, including moving costs and attorney's fees, and physical and emotional distress.

The Hardaways' original reply brief (at 2, 12) states that as of June 1, 2015, "DCHA finally admitted they violated the law and allowed Hardaway access to the DC Housing Voucher Program" by "correct[ing] *ONE* of their June 2013 violations" but that other ongoing injuries and damages from the two-year delay still ensure the case is not moot.

On December 17, 2015, this Court appointed Dina B. Mishra as *amicus curiae* ("Amicus") to present arguments in favor of the Hardaways' position. D.C.

Cir. Item #1589119. On February 19, 2016, Amicus filed in this Court a Motion To Seal Briefs and Appendices Filed In This Appeal. On Amicus's subsequent motion, this Court suspended the briefing schedule on February 25, 2016 pending further order. D.C. Cir. Item #1600831. On May 5, 2016, this Court issued a per curiam order referring the Motion To Seal Briefs and Appendices Filed In This Appeal to the merits panel assigned to this appeal; ordering that all briefs, appendices, and motions papers be locked on the electronic docket pending that motion's disposition and that the parties file public versions of the briefs and appendix; and directing the clerk to enter a new briefing schedule. D.C. Cir. Item #1611892.

## STANDARD OF REVIEW

This Court reviews *de novo* a dismissal for lack of standing or mootness. *LaRoque v. Holder*, 650 F.3d 777. 785 (D.C. Cir. 2011) (standing); *Schmidt v. United States*, 749 F.3d 1064, 1068 (D.C. Cir. 2014) (mootness). This Court reviews a decision not to seal court records for abuse of discretion. *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996).

## SUMMARY OF ARGUMENT

The district court erred in four independent respects in dismissing this case with prejudice and in denying the sealing motion.

18

*First*, the court erred in deciding that the Hardaways lacked Article III standing.   The court misunderstood these *pro se* plaintiffs' allegations and applicable law.  The Hardaways alleged and documented numerous injuries that establish their standing.   At a minimum, they are entitled to jurisdictional discovery.  Those actual or imminent, concrete and particularized injuries include, among others, physical distress; out-of-pocket losses such as higher rent and attorney's fees; discrimination, reputational harms, and stigma causing humiliation and emotional distress; diversion of Lena's resources and frustration of her mission as Angelene's live-in aide; interference with the Hardaways' ability to obtain appropriate housing; and unlawful deprivation of federal rights.  The injuries were traceable to DCHA's alleged conduct: denials of the Hardaways' requests for live-in aide approval, for a two-bedroom housing voucher administered by DCHA on the D.C. payment standard, and for procedural accommodations; and interference with their housing access.   And the injuries were redressable through the relief sought.

*Second*, the district court erred in declaring the two-bedroom voucher claims moot.   The Hardaways suffered ongoing injuries from DCHA's denial of the requested voucher; various filings, properly interpreted, confirm that their injuries could reasonably be expected to recur; and their past injuries, for which the Hardaways sought damages, are not moot regardless.

19

*Third*, even if its standing and mootness rulings were correct, the district court erred in dismissing the case *with prejudice*. The dismissal for lack of Article III jurisdiction should have been without prejudice because it was not a judgment on the merits and because any pleading deficiencies could have been easily rectified by alleging additional facts.

*Fourth*, the district court erred in denying the sealing motion. The court overlooked that the record undisputedly contained medical information about Angelene's disorder, which could harm Angelene's employment prospects and embarrass her. Moreover, the motion's denial prejudiced Angelene by deterring her from submitting other documents that might have supported her claims (including on her injuries supporting Article III jurisdiction) at risk of public access and personal harm. The relevant legal factors counsel for sealing such filings. Accordingly, both the sealing motion denial and the dismissal should be reversed, and the case should be remanded for its consideration subject to a sealing order's protections.

## ARGUMENT

## I.  THE HARDAWAYS' INJURIES ESTABLISH ARTICLE III STANDING

Article III standing requires three elements. *First*, "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). *Second*, her injury must be " 'fairly . . . traceable to the challenged action of the defendant.' " *Id.* (brackets omitted). *Third*, it must be " 'likely' … that the injury will be 'redressed by a favorable decision.' " *Id.* at 561. "The party invoking federal jurisdiction bears the burden of establishing these elements," *id.*, based on " 'the facts as they exist when the complaint is filed,' " *id.* at 569 n.4 (emphasis and internal quotation marks omitted).

The Hardaways have borne their burden to establish Article III standing as of the complaint filing date. On review of a dismissal for lack of subject matter jurisdiction, this Court "assume[s] the truth" of the complaint's allegations and "construe[s] the complaint liberally, granting the plaintiff[s] 'the benefit of all inferences that can be derived from the facts alleged.' " *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011); *see also Lujan*, 504 U.S. at 561 (in reviewing dismissal for lack of standing, "general factual allegations of injury resulting from the defendant's conduct may suffice" and must be " 'presum[ed] . . . [to] embrace those specific facts that are necessary to support the claim' "). The complaint must be particularly liberally construed for *pro se* plaintiffs. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Toolasprashad v. Bur. of Prisons*, 286 F.3d 576, 583 (D.C. Cir. 2002). By those standards, contrary to the

district court's conclusion, JA52, the Hardaways met the elements for standing at this stage: the complaint alleges numerous "injur[ies] in fact" that are traceable to DCHA's actions and redressable by the relief sought.

## A.    DCHA's Denials Of The Requested Housing Voucher And Of Housing Access Caused Article III Injury

The district court dismissed this case for lack of standing on the assumption that the Hardaways did not allege that Angelene's housing access or her requested voucher were ever denied, terminated, or revoked.  JA51.  Yet the court's own earlier order denying the Hardaways' emergency temporary injunction motion directly contradicts that assumption.  JA21 (noting that Angelene "alleges that [DCHA] has denied her request for … a housing voucher for a two-bedroom unit").  And, in fact, the Hardaways made many such allegations in their district court filings that must be considered, including in their emergency temporary injunction motion that was filed with, and to clarify, their complaint.  *See Brown v. Whole Foods Mkt. Grp, Inc.*, 789 F.3d 146, 151-152 (D.C. Cir. 2015) (per curiam) (district court should consider facts alleged in "*all* of [a *pro se* plaintiff's] pleadings," including in an opposition to a motion to dismiss, to avoid dismissal under Federal Rule of Civil Procedure 12(b)(6) (emphasis added)); *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 529 (D.C. Cir. 2015) (considering, for motion to dismiss under Rules 12(b)(1) and 12(b)(6), facts alleged in affidavits and exhibits "because they were filed by a *pro se* litigant and were intended to clarify

22

the allegations in the complaint").  Those allegations are particularly clear when

the pleadings are liberally construed as required.  *Am. Nat'l Ins. Co.*, 642 F.3d at

1139; *Erickson*, 551 U.S. at 94; *Toolasprashad*, 286 F.3d at 583.

For example, the complaint alleges that DCHA "discriminated against

[Angelene] in the provision of services in connection with rental housing and made

housing unavailable to her on the basis of [her] disability," and "interfere[d] with

[the Hardaways'] ability to obtain housing appropriate to their needs."  JA8 ¶14;

JA14 ¶60-61.  More specifically, it alleges that DCHA "refuse[d] *all* reasonable

accommodations request[s]," where the requested accommodations in D.C.

included "*Accommodation in housing*" and the "accommodation[s]" that had been

approved by Montgomery County, which were "to have a live-in aide *and ... a*

*2bedroom voucher*."  JA6-7 ¶¶12-13 (first and third emphases added); *see* JA49

(stating the district court's understanding that Angelene's requests were "for both a

live-in aide and a voucher for a two-bedroom apartment").  Likewise, the

Hardaways' emergency temporary injunction motion, filed with the complaint,

alleges that DCHA attempted to "take back [the] 2 unit voucher" after they moved

in.  JA19.  And the complaint alleges "out-of-pocket losses" to the Hardaways,

JA8 ¶14; that allegation encompasses higher rent from denial or rescission of the

requested voucher.  Yet the district court ignored all of the Hardaways' allegations

about DCHA's summer 2013 denials, including about the July 2013 denial letter, and instead referred only to the post-complaint September 2013 letter.  JA48-50.

Contrary to the district court's opinion, the Hardaways have alleged and contended that three aspects of DCHA's conduct injured them by depriving them of housing access and their requested voucher: (1) that DCHA rescinded the two-bedroom voucher it initially issued; (2) that DCHA denied a voucher based on the D.C. payment standard, rather than the Montgomery County payment standard; (3) that, after the Hardaways moved in, DCHA interfered with the Hardaways' access to their housing.  The injuries traceable to this conduct suffice for Article III standing.

### 1.     DCHA's two-bedroom voucher rescission establishes standing

According to the Hardaways' complaint, DCHA initially issued a two-bedroom housing voucher to Angelene on June 6, 2013, JA7 ¶13, but subsequently "refuse[d] all reasonable accommodations request[s]," which included Angelene's request for a two-bedroom housing voucher to live in D.C.  JA6 ¶12; JA19; JA49.

Such rescission of a two-bedroom voucher causes injury that supports standing.  Where the "plaintiff is himself an object of the action (or foregone action) at issue … there is ordinarily little question that the action or inaction caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-562; *see Fund for Animals, Inc. v. Norton*, 322

F.3d 728, 733-734 (D.C. Cir. 2003) (standing is "self-evident" where plaintiff or its property is the object of the government action). Angelene was the "direct object" of DCHA's regulatory decision to deny her request for a particular voucher, so that denial is unquestionably redressable Article III injury. *See Monroe Energy, LLC v. EPA*, 750 F.3d 909, 915 (D.C. Cir. 2014) (fuel refinery had standing as "direct object" of challenged regulations affecting its entitlements pertaining to credit trading program for its benefit).

Moreover, the Hardaways had already moved into their D.C. apartment when DCHA rescinded the voucher. JA7-8 ¶13. Accordingly, afterward, they faced the decision of either (a) remaining in the apartment, and paying a higher required rental contribution or facing eviction for failing to do so, or (b) moving out despite their lease and thereby incurring moving and other costs. JA19 (explaining that DCHA's decision "to take back [the] 2 unit voucher" and "forc[e] Angelene into a[] one unit voucher" would "forc[e] Angelene to find a new apartment"). These "out-of-pocket losses," or financial or property-related injuries, that trace to the voucher rescission are cognizable for Article III standing. *See Ams. for Safe Access v. DEA*, 706 F.3d 438, 446 (D.C. Cir. 2013) ("In being forced to pay out-of-pocket" for benefits that the plaintiff "could otherwise receive freely," the plaintiff "clearly suffers an 'actual' and 'concrete' injury"); *Nozzi v. Hous. Auth. of L.A.*, 806 F.3d 1178, 1190 (9th Cir. 2015) (voucher recipients had

standing to challenge housing authority's decision to "decrease[] the amount of their Section 8 benefits and therefore increase[] the amount they had to pay in rent"); *Thompson v. Washington*, 497 F.2d 626, 628-633 (D.C. Cir. 1973) (potentially increased rents sufficed for public housing tenants' Article III standing to challenge local housing authority's procedural failures in rent-schedule revision process).

These and other harms the Hardaways allege having suffered from the voucher rescission—such as other "out-of-pocket losses" like "attorney fees," as well as "emotional distress" and "diversion of resources" to counteracting harms, JA7-8 ¶¶13-14; JA8 ¶17; JA15 ¶68(c)—would meet Article III's requirements for standing even if the Hardaways had faced only a *risk* of eviction or of higher required rent, absent those harms' consummation. *See Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979) ("[O]ne does not have to await the consummation of threatened injury to obtain preventive relief." (internal quotation marks omitted)); *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1304-1306 (4th Cir. 1992) (specific threat of eviction from public housing, even where no actual evictions took place, gave rise to injuries for standing, including that it "upset," "insulted," and made "afraid" the plaintiffs); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 445-447 (9th Cir. 1994) (threat of eviction by PHAs afforded standing to challenge a federal regulatory decision that "did no

more than provide an opportunity" for the evictions to be initiated).  Moreover, the

Supreme Court has held that costs reasonably incurred to mitigate or avoid

potential harm, such as fees to consult with an attorney to avoid potential eviction,

establish standing where the risk that harm will occur is at least "substantial."  *E.g.*,

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-155 (2010) (alfalfa

growers had standing based on costs of measures to minimize the risk of gene flow

into their non-genetically-engineered crops); *see Clapper v. Amnesty Int'l USA*,

133 S. Ct. 1138, 1150 n.5 (2013) (declining to overrule, although distinguishing,

cases like *Monsanto*).

  The allegations before this district judge indicate that the Hardaways faced

*well more* than a "substantial risk" of eviction and corresponding harms from

DCHA's conduct.  Those allegations (when the allegations from the Hardaways'

related complaint are considered) collectively indicate that an attempted eviction

occurred within a week of the complaint's filing, such that injuries from that

incident were "certainly impending" and "imminent" when the complaint was

filed, *In re Idaho Conservation League*, 811 F.3d 502, 509 (D.C. Cir. 2016) (citing

*Clapper*, 133 S. Ct. 1138).

  Specifically, the Hardaways' complaint in this case alleges that they

"suffered and continue to suffer … interference with their ability to obtain housing

appropriate to their needs" resulting from DCHA's challenged actions.  JA8 ¶14.

And their related complaint reinforces that they faced a substantial threat of eviction from DCHA's conduct at the time this case's complaint was filed. Add.025-026, ¶¶8-10; *Hardaway*, 2015 WL 5138711, at *1. Specifically, the related complaint alleges that Angelene's leasing agent forcibly attempted to evict the Hardaways on July 18, 2013, Add.025-027, ¶¶8-10—a date shortly after the date on which DCHA issued refusals of Angelene's requests, according to this case's complaint, JA6-8 ¶¶ 12-13, and shortly after this case's complaint's filing. It is proper for this Court to take account of the related complaint's allegations. *Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 607 (D.C. Cir. 1987) (internal quotation marks omitted) ("[I]t is settled law that the court may take judicial notice of other cases including the same subject matter."); *see also Fanning v. Capco Contractors, Inc.*, 711 F. Supp. 2d 65, 69 (D.D.C. 2010) (taking judicial notice of a related case's complaint allegations).

The district judge in this case likewise could be expected to have known of the related complaint's allegations at the time he dismissed this case, since that complaint was also assigned to him and docketed a week before this case's dismissal. Accordingly, particularly because the Hardaways were *pro se*, he should have accounted for the related complaint's allegations in deciding whether to dismiss this case's complaint. The court could and should have done so by treating the related complaint as having amended or supplemented this case's

28

complaint, by consolidating the cases for consideration together, or by at least

notifying the Hardaways of any pleading defects and affording them leave to

amend this case's complaint to include the related complaint's factual allegations.

*See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when

justice so requires."); Fed. R. Civ. P. 15(d) (allowing for supplemental pleadings

describing events that occurred after the initial complaint's filing); *Moore v.*

*Agency for Int'l Dev.*, 994 F.2d 874, 877-878 (D.C. Cir. 1993) ("[L]eave to amend

is particularly appropriate when a plaintiff proceeds *pro se*…. [T]he district court

should give the *pro se* litigant at least minimal notice of [the] pleading

requirements."); *cf. Brown*, 789 F.3d at 152 (allowing a *pro se* plaintiff "to, in

effect, supplement his complaint with the allegations included in his opposition [to

the defendant's motion to dismiss]").  Such an approach would not have been

futile, given the additional injurious consequences alleged by the related

complaint, and would not have prejudiced DCHA, which has recognized the

complaints' relatedness on this appeal by including and discussing the related

complaint in its addendum and in its original brief (at 11-12).  *See Moore*, 994 F.2d

at 877-878.

　　　　In addition, the Hardaways' original opening brief on this appeal (at 4-7),

which may properly clarify any "lingering uncertainty" about those allegations,

*Pegram v. Herdrich*, 530 U.S. 211, 230 (2000), states that DCHA's agents directed

the attempted eviction of the Hardaways, and also directly instructed the

Hardaways that they were not permitted to access, and must move out of, the

apartment.  These more specific facts are "embrace[d]" by, or at least within the

scope of inferences derivable from, the Hardaways' complaint's general factual

allegations, particularly when that complaint is liberally construed as required.

*Lujan*, 504 U.S. at 561; *Am. Nat'l Ins. Co.*, 642 F.3d at 1139; *Erickson*, 551 U.S. at

94; *Toolasprashad*, 286 F.3d at 583.  *See also infra* Section I.A.3 (further

describing the Hardaways' allegations of injury from DCHA's interference with

their housing access).

   Whether the original opening brief is considered or not, the voucher

rescission and its consequences also "frustrated Lena Hardaway['s] job," which

was "to assist [an] individual[] with disabilities" by caring for her as a live-in aide,

and necessitated Lena's "diver[sion] [of] scarce resources" from caring for

Angelene to efforts taken "to address [DCHA's] failure to provide services" to

Angelene and "to counteract the harm" caused by DCHA's conduct.  JA9-15 ¶¶17,

29, 45, 50, 58, 62, 68(c) (describing these harms of "frustration of mission, and

diversion of resources").  Those efforts included "providing services, assistance,

advocacy, and counseling" to Angelene by seeking procedural review of DCHA's

decision, advocating for both Hardaways to DCHA, and seeking an attorney to

avoid eviction.  JA10 ¶29; JA12 ¶50.  Such harms, the Supreme Court has held,

constitute "concrete and demonstrable injur[ies]" such that "there can be no question that the [plaintiff] has suffered injury in fact" supporting Article III standing for Fair Housing Act claims. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (addressing allegations that the plaintiff housing organization had been " 'frustrated … in its efforts to assist equal access to housing' " by defendant's discrimination and "had to devote significant resources to … counteract" defendant's discrimination); *see also Spann v. Colonial Vill.*, 899 F.2d 24, 27-29 (D.C. Cir. 1990) (declaring Article III injury established where plaintiffs "allege[] that purportedly illegal action increases the resources the [plaintiffs] must devote to programs independent of [their] suit challenging the action" (citing *Havens Realty*)); *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138-1141 (D.C. Cir. 2011) (reaffirming these holdings of *Spann* and *Havens Realty*).

These injuries are even more concrete and particularized than those that produced Article III standing in *Havens Realty*. Lena faced injuries from the substantial risk of eviction, which applied not only to Angelene but also to Lena as Angelene's *live-in* aide. *See* JA13-14 ¶58 ("Lena … has been injured by a discriminatory housing practice."). And Lena's job from which resources were diverted is to aid one particular individual, Angelene. In that sense, the diversion of resources harmed Lena *and* Angelene, by detracting directly from Angelene's care and thereby "reduc[ing] the effectiveness of any given level" of Lena's care-

31

provision efforts. *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994). The complaint also alleges concrete, substantial steps that Lena had to take to counteract DCHA's discrimination, such as requesting phone meetings with DCHA and repeatedly attempting to contact DCHA's Ms. Smith regarding the refused requests. JA7, ¶13; JA10 ¶29; JA13-14 ¶¶58, 62; *see also* Orig. Opening Br. 5-6 (describing Lena's efforts in taking Angelene in person to DCHA's office and in arranging an attorney). The voucher denial "perceptibly impaired" Lena's ability to care for Angelene by "caus[ing] an 'inhibition of [her] daily operations.' " *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)). These facts distinguish the Hardaways' appeal from those in which this Court has found plaintiffs to lack standing. *E.g.*, *Rainbow/PUSH Coalition v. FCC*, 396 F.3d 1235, 1240-1242 (D.C. Cir. 2005) (rejecting standing because the plaintiff did not explain how the alleged discrimination "reduced [his job efforts'] effectiveness" or "require[d] [him] to take concrete action in response").

The district court failed to acknowledge any of these harms, instead implying that, despite DCHA's denials, the Hardaways retained uninterrupted access to a two-bedroom voucher approved by Montgomery County's *HOC*. JA51-52 ("[DCHA] acted in accordance with the HOC's decision to provide a

voucher for a two-bedroom unit.").  But under federal voucher portability

regulations, any voucher for a unit in the District of Columbia must be

administered by *DCHA* as the receiving PHA, not by HOC.  24 C.F.R.

§ 982.355(a)-(e).  And the Hardaways' allegations that DCHA "refuse[d] *all*

reasonable accommodations request[s]," JA6-8 ¶¶12-14 (emphasis added), and

"t[ook] back [the] 2 unit voucher," thereby "forcing Angelene into a[] one unit

voucher," JA19, are best understood to allege that DCHA refused to administer

*any* two-bedroom voucher in D.C. (whether issued initially by HOC or by DCHA),

thereby at least temporarily disrupting their access to such voucher.  The

Hardaways' more detailed description of the interference with their housing access,

which is contained in their related complaint, Add.025-026, ¶¶8-9, and original

opening brief (at 4, 6-7), reinforces that understanding.

     The district court inferred its contrary understanding of continued two-

bedroom voucher access from a letter dated September 26, 2013, a date long after

DCHA's summer 2013 denials of Angelene's requests and long after this litigation

commenced.  JA49-52.  Yet that letter, understood consistently with the

Hardaways' allegations, says only that the *September* live-in aide approval denial,

*going forward*, would not reverse HOC's decision to provide Angelene with a two-

bedroom voucher; it says nothing about whether DCHA's *July* denials had

reversed that HOC decision, even if only temporarily.  JA41 (September 2013

33

letter) (declaring "your request for a live-in aide has been **denied**, however *this* determination *will* not reverse the decision of the Housing Choice Voucher Program to provide you with a two (2) bedroom voucher" (latter two emphases added)).  The letter does not describe the status of Angelene's voucher at the relevant time for standing: when the complaint was filed.  *Lujan*, 504 U.S. at 569 n.4.

Regardless, even if Angelene had retained access to a two-bedroom voucher throughout this case, DCHA's actions reasonably led the Hardaways to believe she did not, and hence faced a substantial risk of higher rent or eviction.  Accordingly, even in that event, the Hardaways suffered injuries (such as emotional distress and out-of-pocket costs and diversion of resources to prevent or counteract the threatened harms) that support their Article III standing.

## 2.    DCHA's denial of a voucher based on the D.C. payment standard establishes standing

Even if, contrary to the Hardaways' allegations, Angelene had uninterrupted access to a two-bedroom voucher after DCHA's summer 2013 denials, the Hardaways alleged she suffered other "out-of-pocket losses" from DCHA's refusal of all of her reasonable accommodations requests.  JA6-8 ¶¶12-14.  More specifically, their original opening brief states that Angelene suffered an out-of-pocket loss from higher rent because, after DCHA's voucher rescission at least through June 1, 2015, any voucher to which she had access paid based on the

*Montgomery County, Maryland* payment standard, which was lower than the

applicable D.C. payment standard. *See* Orig. Opening Br. 7, 10-11 ("After DCHA

rescind[ed] their two-unit voucher[,] Hardaway only had access to [a] Maryland

Choice Voucher; which has a lower rent allotment … therefore causing Plaintiff

damages each month."); Orig. Reply Br. 2, 12.

Indeed, when the complaint was filed, it seems that D.C.'s payment standard

for a two-bedroom apartment was higher than the Montgomery County payment

standard.[2]  Under federal voucher portability regulations, DCHA was required to

use the D.C. payment standard, not the Montgomery County one, to calculate

Angelene's voucher subsidy. *See* 24 C.F.R. § 982.355(e)(2) ("The amount of [the

voucher subsidy] for a portable family in the receiving PHA program is determined

in the same manner as for other families in the receiving PHA program."); *see*

Voucher Program Guidebook: Housing Choice § 13.5, at 13-5 (Apr. 2001)

(produced for U.S. Department of Housing & Urban Development), *available at*

http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclip

_____

[2] In 2013, the D.C. payment standard was "110% of the Fair Market Rents for all size units." D.C. Mun. Regs. tit. 14, § 8300.2(e) (2013). The Fair Market Rent for a two-bedroom unit in D.C. for Fiscal Year 2013 was $1412. *Final Fair Market Rents for the Housing Choice Voucher Program and Moderate Rehabilitation Single Room Occupancy Fiscal Year 2013*, 77 Fed. Reg. 61,158, 61,175 sched. B (Oct. 5, 2012). Thus, the D.C. payment standard was 110% of $1412, which rounds to $1553. It seems that the Montgomery County payment standard for Angelene's HOC voucher, by contrast, was only $1538. *See* Orig. Opening Br. 33 (reproducing attachment to Angelene's Maryland Choice Voucher dated March 21, 2013, which indicates "Your Payment Standard is $1,538.00").

s/guidebooks/7420.10G ("The receiving PHA's payment standards are used when the portable family leases a unit.").  Even if not, DCHA could have approved using the higher payment standard for the Hardaways as a reasonable accommodation, 24 C.F.R. § 985.505(d), but the Hardaways alleged that all reasonable accommodation requests were refused, JA6-7 ¶12.  All else equal, a lower payment standard, under the relevant regulations, decreases the voucher subsidy and thereby increases required rent from the tenant.[3]

Therefore, according to the Hardaways, DCHA's denials injured Angelene by increasing her required rental contribution.  The out-of-pocket losses from satisfying that requirement, or threat of eviction for failing to satisfy it, are injuries that establish standing.  *See supra* Section I.A.1.

### 3.    DCHA's interference with housing access establishes standing

As noted above, the Hardaways' complaint allegations in this and their related case before the same judge indicate that DCHA injured the Hardaways by

---

[3] When the complaint was filed, it seems the Hardaways' gross rent exceeded the payment standard.  *See* Orig. Opening Br. 39 (reproducing first page of Angelene's original June 26, 2013 apartment lease, which indicates gross rent of $1598, which exceeds the 2013 D.C. ($1553) and Montgomery County ($1538) payment standards, *see supra* note 2).  The consequently applicable calculation sets the voucher subsidy equal to the payment standard minus an amount calculated by reference to the tenant family's income.  42 U.S.C. § 1437f(o)(2)(B); 24 C.F.R. §§ 982.505(b)(1), 5.628(a).  Thus, a lower payment standard produces a lower voucher subsidy.  Because the tenant's rental contribution equals gross rent minus the voucher subsidy, *id.* § 982.515, a lower voucher subsidy produces a higher rental contribution.

interfering with their housing access.  *See supra* pp. 27-28.  Specifically, this

case's complaint alleges that "DCHA's discriminatory failure to provide … equal

access to DCHA's programs and services interfered with [the Hardaways'] ability

to obtain rental housing that met their needs," resulting in various harms including

"physical and emotional distress" and "out-of-pocket losses."  JA7-8 ¶¶13-14;

JA14 ¶61; JA15 ¶¶67, 68(c).  And the related complaint further alleges that on July

18, 2013, just a week after this case's filing, Angelene's leasing agent tried to

forcibly evict the Hardaways by physically blocking their access, "forcibly

attack[ing]" them, and attempting to physically force Angelene to sign a new

contract.  Add.025-026, ¶¶8-9.  The district court erred in failing to account for

these allegations in deciding this case.  *See supra* pp. 28-29.  At a minimum, this

Court may now take judicial notice of the related complaint's allegations.  *Veg-

Mix, Inc.*, 832 F.2d at 607; *Fanning*, 711 F. Supp. 2d at 69.

     This Court should also account for the Hardaways' original opening brief's

more detailed description (at 4-7) of how DCHA directed the leasing agent's denial

of housing access to the Hardaways (which, the brief contends (at 7), occurred as

"the direct and proximate result of DCHA's agents['] action") and instructed the

Hardaways, both before and after this case's complaint's filing, that they were not

permitted to access their apartment and must move out immediately, resulting in

the injuries alleged.  That specific description is embraced by this case's

37

complaint's general factual allegations, or is at least within the scope of inferences derivable from them, particularly when the complaint is liberally construed as required. *Lujan*, 504 U.S. at 561; *Am. Nat'l Ins. Co.*, 642 F.3d at 1139; *Erickson*, 551 U.S. at 94; *Toolasprashad*, 286 F.3d at 583; *see also Pegram*, 530 U.S. at 230 (appellate brief may clarify "lingering uncertainty" about complaint allegations).

Regardless of whether this Court accounts for the Hardaways' original opening brief, however, the injuries alleged in this case's complaint and the related complaint from the housing access interference were at least "imminent" and "certainly impending" at the time the Hardaways filed suit, *In re Idaho Conservation League*, 2016 WL 363297, at *4 (citing *Clapper*, 133 S. Ct. 1138), since their precipitating events are alleged to have occurred before and within a week after the complaint's filing. And each of those injuries is concrete and particularized. *See Columbia Basin Apartment Ass'n v. City of Paco*, 268 F.3d 791, 797 (9th Cir. 2001) (eviction is concrete injury); *Yesler*, 37 F.3d at 446-447 (finding standing based on attempted evictions).

The "physical … distress," JA8 ¶13, such as from the leasing agent's alleged physical attack in attempting to evict the Hardaways, Add.025-026, ¶8, is cognizable physical injury. *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007) ("[P]hysical injuries … are plainly concrete harms under the Supreme Court's precedents."). The alleged

38

"humiliation, frustration, ... [and] emotional distress," JA8 ¶14, are cognizable

injuries that stigmatize Angelene as one suffering discrimination—that is, "a

personal denial of equal treatment"—because of her disability. *In re Navy*

*Chaplaincy*, 534 F.3d 756, 769 & n.9 (D.C. Cir. 2008) (noting that " 'personal

offense' or emotional injury" can suffice for Article III standing in such

circumstances (citing, among other cases, *Allen v. Wright*, 468 U.S. 737, 755

(1984); and *Gray v. Greyhound Lines, E.*, 545 F.2d 169, 175 (D.C. Cir. 1976)); *see*

*Women's Equity Action League v. Cavazos*, 879 F.2d 880, 885 (D.C. Cir. 1989)

(similar); *Heckler v. Mathews*, 465 U.S. 728, 738 (1984) (similar). And Lena's

resource-diversion injuries from DCHA's conduct are also cognizable, as Section

I.A.1 explained.

All these injuries are traceable to—indeed, the Hardaways' original opening

brief (at 7) calls each the "direct and proximate result" of—the refusal of housing

access that the Hardaways alleged. And each is redressable by the relief sought,

including damages. *See supra* Section I.A.1.

**B.    DCHA's Denial Of Live-In Aide Approval Inflicted Article III Injury**

DCHA undisputedly formally denied Angelene's reasonable accommodation

request to have Lena approved as her live-in aide. *See* JA49-52; DCHA Orig. Br.

3, 9, 10, 16; JA6-8 ¶¶12-13; JA41; JA35-JA36. Denying that approval had adverse

legal consequences that establish the Hardaways' standing, regardless of DCHA's alleged direct denials of their requested voucher and their housing access.

*First*, denying live-in aide approval affected the unit size to which Angelene was automatically entitled under the HCVP regulations. Specifically, with an approved live-in aide, Angelene would be automatically entitled to a two-bedroom housing voucher, but without one, the most to which she would be automatically entitled as a single-person family would be a one-bedroom housing voucher.[4] Although DCHA could have granted an exception for a larger unit size, to have done so here it must have affirmatively determined that the exception was justified by Angelene's disability, essentially as an accommodation. 24 C.F.R. § 982.402(b)(8) (allowing the exception to override the general "one bedroom for a single-person family" rule only for "a disabled or elderly person" or a family member that survives the original head of household's death); D.C. Mun. Regs. tit. 14, §§ 5206.1-.2, 5317.8 (same). The complaint alleges, however, that DCHA "refuse[d] *all* reasonable accommodations request[s]" made by the Hardaways. JA6 ¶12 (emphasis added). And even the September 2013 letter indicates that

---

[4] *See* 24 C.F.R §§ 982.402(b)(6)-(7) (a PHA-approved live-in aide shall be counted in determining the voucher size, and "[u]nless a live-in aide resides with the family, the family unit size for any family consisting of a single person must be [at most a] one-bedroom unit"); D.C. Mun. Regs. tit. 14, §§ 5205.2(e), (g), 5205.3(e) (a DCHA-approved live-in aide shall be counted in determining the voucher size; and "[t]he voucher size for any Family consisting of a single person shall only be a one (1)-bedroom" except that "[a] live-in aide approved by DCHA shall be allocated an individual bedroom" (emphasis added)).

DCHA's position was that, contrary to the medical form Angelene sought to provide, JA6-8 ¶¶12, 14; JA17-18, her disability did not necessitate the additional bedroom for a live-in aide, JA41 (emphasizing DCHA's position that Angelene is "able to perform basic requirements of daily living on [her] own").

Consistent with these regulations, the Hardaways alleged that DCHA's denial of live-in aide approval was the basis for its denial of Angelene's requested voucher, such that the injuries that trace to the latter denial (*see supra* Section I.A) trace to the former as well. *See, e.g.*, JA14 ¶61 ("DCHA's discriminatory failure to provide [a] live in aide … interfered with Plaintiffs['] ability to obtain rental housing that met their needs").

*Second*, DCHA's denial of live-in aide approval undercuts Angelene's legal entitlement to have Lena admitted to reside in the apartment.  Under federal regulations, an HCVP tenant is not entitled to have an unapproved live-in aide reside in the unit.  24 C.F.R. § 982.551(h)(2), (4) ("The composition of the assisted family residing in the unit must be approved by the PHA…. No other person may reside in the unit (except for a foster child or live-in aide as provided in paragraph (h)(4) …).  (4) *If the PHA has given approval*, a foster child or live-in aide may reside in the unit." (emphasis added)).  Without DCHA's live-in aide approval of Lena, then, the unit owner presumably may seek to exclude Lena, causing the various injuries alleged, JA7-8 ¶¶13-14; JA14 ¶¶60-61; JA15 ¶67.

41

*Third* and *fourth*, the denial of live-in aide approval inflicted procedural injuries on the Hardaways (including diversion of Lena's resources) and unlawfully deprived them of their federally statutorily protected rights against disability-based discrimination, as Sections I.C and I.D of this brief discuss.

The district court concluded that the Hardaways were not injured by DCHA's live-in aide approval denial because "DCHA allowed 'Lena Hardaway[] to live with [Angelene Hardaway] as [Angelene's] live-in aide' "; and the court noted that an October 18, 2013 "Tenant Profile" indicates "L" in the "relationship" field for Lena, which, according to DCHA, means "live in aide."  JA50 (quoting JA36; and citing JA43).  But the injuries described above derive from DCHA's repeated denials of *formal approval* of Lena as a live-in aide to Angelene, such as through DCHA's summer 2013 denials of all reasonable accommodation requests, including the request for a live-in aide, JA6-8 ¶¶12-14, and through DCHA's September 2013 denial letter, JA41.  Such injuries do not depend on whether DCHA merely purportedly "acquiesced" to Lena's presence in Angelene's unit, JA52, and/or listed Lena as a live-in aide on an informal tenant profile months after this lawsuit was filed.  Even if such acquiescence *could* obviate ongoing injury to the Hardaways once it purportedly occurred, much of the damage from the formal denials (and/or from efforts to prevent their effects) had already been done by then.

42

MATERIAL UNDER SEAL DELETED

**C.    DCHA Inflicted Procedural Injuries That Support Standing**

The Hardaways also alleged they suffered procedural injuries as a result of

DCHA's "refus[al] [of] all reasonable accommodations request[s]," including its

denials of live-in aide approval, the voucher, and housing access.  For example, the

Hardaways identified DCHA's refusal to accept Angelene's doctor's report;

DCHA's insistence on in-person meetings with Angelene rather than phone

meetings and/or meetings including Lena; DCHA's addressing the July 2013

denial letter to Angelene ███████████████████████████████; and

DCHA's failure to provide notice of the reasonable accommodations denials

before the Hardaways' move-in date as among the discriminatory procedural

burdens imposed upon them.  JA6-8 ¶¶12-14.  Those burdens, their complaint

alleges, deprived them of effective communication and equal access and

opportunity to DCHA's benefits, services, programs, and activities.  JA9 ¶¶23-25.

Accordingly, the procedural accommodations denials deprive them of the

statutorily mandated "equal opportunity to use and enjoy a dwelling," 42 U.S.C.

§ 3604(f)(3), thereby causing the various alleged harms.  JA7-15 ¶¶13-14, 17, 29,

45, 50, 58, 62, 68(c).

These procedural injuries suffice for Article III standing.  A cognizable

procedural injury occurs when a defendant's action "is undertaken without

following a required procedure, and that procedure both is 'designed to protect

43

some threatened concrete interest' of the plaintiff and, if not followed, 'will cause a distinct risk to a particularized interest of the plaintiff.' " *Huron v. Cobert*, 809 F.3d 1274, 1279 (D.C. Cir. 2016). The Hardaways' claims are "tethered to some concrete interest adversely affected by the procedural deprivation." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488. 497 (2009)). Specifically, the procedural deprivations adversely affect the Hardaways' concrete interests in having Lena approved as Angelene's live-in aide, in the two-bedroom housing voucher based on the D.C. payment standard, and in their housing access, as Sections I.A and I.B discuss. These interests are particularized to Angelene and Lena.

These injuries also meet traceability and redressability requirements. This Court "relax[es] the redressability and imminence requirements for a plaintiff claiming a procedural injury." *WildEarth*, 738 F.3d at 305; *see Lujan*, 504 U.S. at 572 n.7. The Hardaways need not "show that but for the alleged procedural deficiency [DCHA] would have reached a different substantive result." *WildEarth*, 738 F.3d at 306; *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007). "[T]his Court will assume a causal relationship between the procedural defect," such as denial of phone meetings or rejection of Angelene's supplied doctor's report, "and the final agency action," such as denial of live-in aide approval or of the two-bedroom voucher. *City of Dania Beach*, 485 F.3d at 1186.

44

The Hardaways need only allege a causal link between their claimed injuries and DCHA's decisions rendered pursuant to the challenged procedures.  *See id.*  They have done so.  Their complaint alleges that their injuries occurred "[a]s a result of" DCHA's unlawful decisions, including its denials of live-in aide approval and other reasonable accommodations requests.  *See* JA6-8 ¶¶ 12-14; JA15 ¶68(c).

**D.     DCHA's Federal Statutory Rights Deprivations Are Article III Injuries**

The complaint alleges that DCHA's discriminatory conduct and denials of accommodations and equal access violated the Fair Housing Act, Americans with Disabilities Act, and Rehabilitation Act.  JA5-15 ¶¶6, 12-68.  These "unlawful deprivation[s] of [the Hardaways'] federally protected rights," JA8 ¶14, would be Article III injuries even absent their many other adverse consequences.

This Court has held that the violation of an individual statutory right can comprise a concrete and particularized injury for Article III standing even where the plaintiff has suffered no pecuniary injury and would lack any judicially cognizable injury for standing absent the statute.  *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 444 F.3d 614, 617-619 (D.C. Cir. 2006) (citing *Warth v. Seldin*, 422 U.S. 490, 514 (1975); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973); *Lujan*, 504 U.S. at 578); *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1042-1043 (D.C. Cir. 2010).  This proposition is particularly well established for Fair Housing Act claims, *see Havens Realty*, 455 U.S. at 373-374, and similarly has been stated

45

for the ADA and Rehabilitation Act, *e.g.*, *Fulton v. Goord*, 591 F.3d 37, 41-42 (2d Cir. 2009) (noting that injury in fact " 'may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing,' " and that the ADA and Rehabilitation Act confer such a substantive right—namely, a right to be free from disability-based discrimination (quoting *Warth*, 422 U.S. at 500)).

The Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, No. 13-1339, 2016 WL 2842447 (U.S. May 16, 2016), did not change this well-settled law. The Court in *Spokeo* only remanded for the court of appeals to analyze the concreteness of a plaintiff's injuries for Article III standing. *Id.* at *3. The majority opinion's discussion of statutory rights was directed toward *procedural* rights and did not disturb the longstanding principle that Congress may statutorily render even an intangible injury "concrete," such as by defining a substantive right for or against particular conduct by a defendant. *See id.* at *7-8 (confirming that intangible injuries can be concrete; emphasizing Congress's important role in deciding that "an intangible harm constitutes injury in fact"; expressly preserving *Lujan*'s holding that Congress may define injuries that will establish Article III standing that would not otherwise exist; raising questions about statutory rights only as to "a bare *procedural* violation, divorced from any concrete harm" (emphasis added); and even then emphasizing that some procedural violations can suffice for injury in

fact without "alleg[ing] any additional harm beyond the one Congress has identified" (emphasis omitted)).

Here, the Hardaways alleged violations of their substantive statutory rights to be free from disability-based discrimination in housing.  Those allegations establish Article III standing.  But this Court need not even reach this issue, because the Hardaways' standing may be grounded on the many indisputably concrete harms outlined earlier in this brief.

## E.    The Hardaways Were At Least Entitled To Jurisdictional Discovery

Even if the Hardaways' allegations were not sufficient for standing, the Hardaways at least would be entitled to a remand for jurisdictional discovery.  *See Obama v. Klayman*, 800 F.3d 559, 561, 565, 568-569 (D.C. Cir. 2015) (per curiam) (remanding for a decision concerning whether limited discovery to explore jurisdictional facts pertaining to standing would be appropriate).  The district court dismissed this case for lack of standing even though DCHA did not argue lack of standing below.  JA51-52; JA30; JA32-37.  And the Hardaways noted in opposing dismissal that they had no opportunity for any discovery, JA44, which includes discovery of jurisdictional facts.  Among other things, the clarifying detail in the related complaint's and original opening brief's descriptions of DCHA's interference with the Hardaways' housing access (such as their mentions of an attempted eviction), Add. 025-026; Orig. Opening Br. 4-7, demonstrate the "likely

47

utility" of jurisdictional discovery if the Court were to find this case's pleadings inadequate. *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1024-1025 (D.C. Cir. 1998).

## II.  THE HARDAWAYS' CLAIMS WERE NOT MOOT

The district court ruled that some of the Hardaways' claims (those regarding their request for a two-bedroom voucher) were moot.  JA52 n.3.  This was error.

**1.**  The district court's mootness ruling rested on the same mistaken premises as its standing ruling.  The Hardaways' many allegations, which must be assumed true at this stage, *Am. Nat'l Ins. Co.*, 642 F.3d at 1139; *Abdelfattah*, 787 F.3d at 529, contradict the court's suggestion that Angelene *never* lacked access to a two-bedroom voucher, JA51-52.  *See supra* Section I.A.  And DCHA's undisputed formal denial of live-in aide approval undercut Angelene's regulatory entitlement to a two-bedroom voucher.  *See supra* Section I.B.  Accordingly, the two-bedroom voucher claims were not moot from the litigation's outset as the district court's standing ruling implied, JA51-52 & n.3.

**2.**  DCHA's grounds for asserting mootness before the district court were likewise flawed.  Although DCHA claimed it ceased denying access to a two-bedroom voucher *after* the complaint was filed, JA36, generally, "a defendant's 'voluntary cessation of allegedly illegal conduct does not deprive [a court] of power to hear and determine the case.' "  *Am. Bar Ass'n v. Fed. Trade Comm'n*,

48

636 F.3d 641, 648 (D.C. Cir. 2011) (quoting *Cnty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979)).  Such voluntary cessation only moots a case if (a) "it is '*absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur,' " *Adarand Constr., Inc. v. Slater*, 528 U.S. 216, 222 (2000), and (b) " 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation,' " *Kifafi v. Hilton Hotels Retirement Plan*, 701 F.3d 718, 724-725 (D.C. Cir. 2012) (quoting *Am. Bar Ass'n*, 636 F.3d at 648); *Davis*, 440 U.S. at 631.   DCHA, as the defendant asserting mootness, must bear that " 'formidable' " and "heavy" burden of proof, *Slater*, 528 U.S. at 222; *Friends of the Earth, Inc v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). DCHA failed to satisfy that burden.

The allegations in this case that must be assumed true, *Am. Nat'l Ins. Co.*, 642 F.3d at 1139; *Abdelfattah*, 787 F.3d at 529, and in related cases of which this Court can take judicial notice, *Veg-Mix, Inc.*, 832 F.2d at 607; *Fanning*, 711 F. Supp. 2d at 69, establish that DCHA's challenged conduct could reasonably be expected to recur and had ongoing injurious effects that were not completely eradicated.

This case's complaint, for example, alleges DCHA's repeated denials of the Hardaways' reasonable accommodations requests, JA6-8 ¶¶12-13, which supports a conclusion that DCHA would further repeat those denials.  (The September 2013

denial letter reinforces that conclusion by itself repeating the live-in aide approval denial even after this litigation commenced.  JA41.)

The Hardaways' related complaint also alleges that, after this case's complaint was filed, Angelene's leasing agent attempted to evict the Hardaways, Add.025-026, ¶¶8-9.  And, as noted, the Hardaways' original opening brief (at 7) contends that this attempted eviction occurred at DCHA's direction, consistent with this case's complaint's allegation that the Hardaways would continue to suffer from DCHA's interference with their ability to obtain appropriate housing, JA8 ¶14; JA14 ¶¶60-61.  Attempts to evict the Hardaways, and DCHA's direction of further attempts, would be easy to resume even if they have now ceased.

Similar conduct by DCHA has been alleged and challenged in other recent cases.  That pattern further undercuts a conclusion that DCHA's challenged conduct will not recur or have lingering effects.  In *Young v. D.C. Housing Authority*, 31 F. Supp. 3d 90, 96 (D.D.C. 2014), other disabled plaintiffs raised similar procedural accommodations denial claims, and another federal district judge rejected DCHA's assertion of mootness by relying upon their complaint allegations of DCHA's "multi-year history of … repeatedly failing to facilitate effective communication with [them] despite repeated requests … and despite assurances from [DCHA] on several occasions."

50

DCHA's own filings do not prove otherwise. DCHA's motion-to-dismiss memorandum asserted only DCHA's "position" that it would provide Angelene with a two-bedroom voucher and allow Lena to live with Angelene as a live-in aide. JA36. That assertion did not obligate DCHA to continue any particular course of behavior. Likewise, neither of the two other documents invoked by the district court, JA49-50—the September 2013 denial letter and the October 2013 tenant profile, JA41-43—meets DCHA's heavy burden on mootness.

The September 2013 denial letter offers no formal assurance that Angelene would retain access to a two-bedroom voucher. To the contrary, it denied Angelene's live-in aide approval request of July 11, 2013, thereby rejecting her *automatic* entitlement to a two-bedroom voucher under HCVP regulations. JA41; *see supra* Section I.B. Although it states that "*this* determination *will* not reverse the decision of the Housing Choice Voucher Program to provide you with a two (2) bedroom voucher," JA41 (emphases added), that may signify only that the *September letter*'s denial did not reverse the prior decision to issue the two-bedroom housing voucher *that had already been reversed* by DCHA's summer 2013 denials. JA6 ¶12 (DCHA "refused all reasonable accommodations request[s]"). By that understanding, the effects of the July denials, including the the two-bedroom voucher denial, would continue even after the September letter.

Even if the September 2013 letter were understood to formally declare that HCVP would provide a two-bedroom voucher, it did not declare DCHA's commitment to administer that voucher *based on the D.C. payment standard*. Instead, it might simply declare that DCHA will not prevent HOC from administering a voucher based on the Montgomery County payment standard. Consistent with this understanding, DCHA and the district court described the September 2013 letter as not reversing *HOC*'s, as opposed to *DCHA*'s, decision to issue a two-bedroom voucher.  *See* JA35 (stating that "DCHA will not reverse the decision of the *Housing Opportunities Commission of Montgomery County* to provide plaintiff with a two bedroom unit"); JA51-52 (referring to DCHA's decision to deny the live-in aide but to "act[] in accordance with the *HOC's* decision to provide a voucher for a two-bedroom unit" (emphasis added)).  If the September letter simply did not disturb an HOC voucher based on the Montgomery County payment standard, which was lower than the D.C. payment standard for 2013, then Angelene's out-of-pocket losses were ongoing and would continue past the letter's date.  *See supra* Section I.A.2.

A similar analysis applies to the October 18, 2013 tenant profile.  The district court emphasized that the profile lists "L" in the "relationship" field for Lena, JA50, which, according to DCHA, signifies "live-in aide," JA36.  At most that shows that on that particular date DCHA had listed Lena as a live-in aide to

Angelene on a single document of unclear import.  DCHA has not shown that the tenant profile is anything other than an internal and informal document; the profile indicates nothing about Lena's status between the July denials and October 18, 2013 (during which period the related complaint alleges that the Hardaways suffered an attempted eviction, Add.025-026, ¶¶8-9); and the profile offers no assurance about Lena's listing or status as of any date thereafter.

In fact, as DCHA admitted, its Interim ADA/504 Coordinator formally had denied Lena live-in aide status.  JA36.  DCHA asserted, as of October 21, 2013, that "*HCVP* has determined, despite [that denial], that it will allow … Lena … to live with Plaintiff as Plaintiff's live in aide," and that DCHA was, in practice, allowing Lena to live with Angelene as a live in aide.  *Id.* (emphasis added).  But the referenced determination by HCVP might have been one made by *HOC* rather than DCHA.  And the suggestion that DCHA did not act to exclude Lena from the apartment during the relevant period (which is at odds with the related complaint's allegations about the attempted eviction, Add.025-026, ¶¶8-9) offers no commitment for the future.  It is the *formal denial of DCHA's approval* of Lena as a live-in aide that carries negative legal repercussions, such as loss of automatic entitlement to the two-bedroom voucher and of entitlement to have Lena live in the apartment regardless of the owner's objection.

**3.**   Regardless, the Hardaways' compensatory damages claims are not moot. Such damages are statutorily available for the Hardaways' past injuries.   JA7-8 ¶¶13-14; JA15 ¶68(c) (asserting various compensable past injuries from DCHA's challenged conduct, such as out-of-pocket losses, physical and emotional distress, and diversion of Lena's resources); *see* Statement of the Case, Sections A.2-A.3. Until those damages are awarded, the past injuries remain unredressed and the case is not moot. *See Alvarez v. Smith*, 558 U.S. 87, 94 (2009) (a "damages claim saves [a] case from mootness"); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007); *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609-610 (2001) (defendant's change in conduct will not moot a case if plaintiff has cause of action for damages).   The September 2013 letter and October 2013 tenant profile post-date the onset of those past injuries by several months and so fail to undo that already suffered harm.   And even if some of the ongoing injuries ceased on June 1, 2015, when the Hardaways' original reply brief says (at 2, 12) that DCHA corrected one of its violations and allowed Angelene access to the voucher program, the damages claimed for the period until that date preclude a mootness dismissal.

## III.   THE DISTRICT COURT ERRED BY DISMISSING THE CASE *WITH PREJUDICE*

Even if the district court's opinion's reasoning were entirely correct, the court erred in dismissing the case *with prejudice*.   JA53.   The court's basis for

54

dismissing the claims was lack of Article III jurisdiction—for most of them, lack of standing; for a subset, mootness.  JA51-52 & n.3; *see Laidlaw*, 528 U.S. at 180 (standing and mootness are Article III jurisdiction doctrines).  Such jurisdictional dismissals should be without prejudice, because they are not judgments on the merits.  *See Kasap v. Folger Nolan Fleming & Douglas, Inc.*, 166 F.3d 1243, 1248 (D.C. Cir. 1999) (dismissal with prejudice is improper for a jurisdictional dismissal, since it is not a decision on the case's merits); *see also Coll v. First Am. Title Co.*, 642 F.3d 876, 892 (10th Cir. 2011) (dismissal for lack of standing should be without prejudice); *Flynt v. Weinberger*, 762 F.2d 134, 135-136 (D.C. Cir. 1985) (dismissal for mootness should be without prejudice).

Moreover, a dismissal with prejudice is erroneous where the plaintiffs may be able to cure their pleading deficiency by alleging additional facts.  *See Andrx Pharm., Inc. v. Biovail Corp., Int'l*, 256 F.3d 799, 807-808 (D.C. Cir. 2001).  Here, any pleading deficiency concerning the Hardaways' injuries for standing easily could be rectified by more specifically describing the harms that the Hardaways' pleadings allege, such as by directly incorporating the detail contained in the Hardaways' original appellate briefing.

MATERIAL UNDER SEAL DELETED

## IV.  PREJUDICE FROM THE SEALING MOTION DENIAL REQUIRES BOTH ITS REVERSAL AND REVERSAL OF THE CASE'S DISMISSAL

The district court's denial of the Hardaways' sealing motion, JA26-27, is an issue now ripe for this appeal,[5] and it is accordingly addressed in this brief.  (The issue of sealing this case's *appellate* filings is addressed by the motions papers on Amicus's Motion To Seal Briefs And Appendices Filed In This Appeal, which this Court's motions panel has referred to the merits panel for this appeal.  D.C. Cir. Items #1599752, #1602479, #1603484.)

The district court erred in denying the Hardaways' sealing motion.  It overlooked that Angelene's medical information was contained in the district court record, misstating that "to date, none of the documents filed in this action is a medical record."  JA27 n.1.  In fact, the record contained a medical report completed by Angelene's doctor, as well as other medical information about Angelene's disability, such as a description of her condition ███████████ ███████████████████████, its symptoms ███████████████ █████████████████████████████████████████████████████████

---

[5] The Hardaways sought to interlocutorily appeal that denial, JA28-29, but this Court dismissed that appeal for lack of jurisdiction due to lack of a final or appealable collateral order.  D.C. Cir. No. 13-7138 Item #1502003.  When the district court later issued a final case dismissal order, however, the interlocutory sealing motion order merged into the dismissal order and became reviewable.  *See, e.g., I.A.M. Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 24 (D.C. Cir. 1986) ("[W]hen an interlocutory order is not appealable and so merges into the final judgment, it *is* open to review on appeal from that judgment.").

MATERIAL UNDER SEAL DELETED



, and her corresponding

needs for particular accommodation ███████████████████████████

███████████████████████. JA17-18; JA6-8 ¶¶12-14.  DCHA has

conceded as much.  *See* DCHA Opposition To Amicus's Motion To Seal Briefs

And Appendices Filed In This Appeal 5-7, D.C. Cir. Item #1602479

(acknowledging that medical information and medical records were filed in the

district court, including in the complaint and attached doctor's report; ███████

███████████████████████████████████████████████████████████

███████████████████ and that "[o]f course this is the type of information

that Ms. Hardaway has an interest in protecting").

The district court's allowance that the Hardaways could seek a protective

order or seek to redact as appropriate as to *future* filings, JA27 n.1, afforded the

Hardaways no protection for the medical information already in the record, which

they argued could harm Angelene's employment prospects and cause her

embarrassment, JA23-24.  And the advent of electronic docketing and Internet case

file access, with its correspondingly heightened risk of harm, has made even more

pressing the need to seal medical records like Angelene's, which the Hardaways'

original opening brief (at 18) said was publicly available on the Internet as of April

8, 2015.  Accordingly, the district court's own privacy notice regarding electronic

access to case files encourages parties to move to seal medical record filings, as the Hardaways did.  U.S. District Court for the District of Columbia, Civil Privacy Notice: Notice Regarding Privacy and Public Access to Electronic Civil Case Files, http://www.dcd.uscourts.gov/dcd/civil_privacy_notice (Sept. 2004).

The Hardaways have stated that the sealing motion denial also prejudiced them by deterring them from filing other documents that contain Angelene's medical information and that would have supported their claims, including their claims of injury for Article III jurisdiction.  JA24; Orig. Opening Br. 2, 18-22, 29 (noting that "Angelene Hardaway is TERRIFIED to file any more sensitive documents due to this violation of her privacy," and that denying the sealing motion "intimidate[d]" her and "limit[ed] the proof [she] could provide the court," including "documents [that] were critical [to] improving plaintiff[s'] complaint").  DCHA's own original brief in this appeal (at 14) reinforces that argument by seeking to characterize Angelene's condition as one that "hardly seems consistent with someone who is so impaired as to be unable to function without an aide"—a characterization that further medical documentation might have refuted even more clearly than did Angelene's doctor's report in the record.  Moreover, Angelene might have supplied the district court with the July 2013 denial letter or other documentation of DCHA's injurious conduct had they been protected by an order sealing her sensitive medical information in those documents.

This Court has declared that "[t]he right to inspect and copy judicial records is not absolute." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (2011). The consideration of six factors can act to overcome this Court's " 'strong presumption in favor of public access to judicial proceedings' ": (1) the need for public access to the documents at issue; (2) the extent of previous public access to them; (3) the fact that someone has objected to disclosure, and that person's identity; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced. *Primas v. District of Columbia*, 719 F.3d 693, 698 (D.C. Cir. 2013) (quoting *Nat'l Children's Ctr.*, 98 F.3d at 1409; and citing *United States v. Hubbard*, 650 F.2d 293, 317-322 (D.C. Cir. 1981)).

Those factors counsel for sealing here. The justification for sealing filings as to Angelene's medical disorder and medical records was and is particularly strong. There was little need for the public to access the details of Angelene's disability. The information was shared with HOC and DCHA only to obtain live-in aide approval and a voucher, but was not made generally publicly accessible. Angelene continues to object to the disclosure of her personal medical information, in which she has strong privacy interests. As discussed, that disclosure prejudiced her by harming her employment prospects and reputation and by deterring her from filing additional documents that could help her case. And the documents that

were in the record were there for the sole purpose of obtaining relief for individual

federal rights violations.  Many courts have ordered sealing in like circumstances.

*See Myers v. Knight Protective Serv.*, 774 F.3d 1246, 1249 (10th Cir. 2014)

(granting motion to seal certain medical records in an ADA case); *cf. In re Sealed*

*Case (Medical Records)*, 381 F.3d 1205 (D.C. Cir. 2004) (in a sealed case,

concluding that district court abused its discretion by requiring production of

certain "mental retardation records" to plaintiffs' counsel without sufficiently

weighing privacy interests against evidentiary need for the records at issue); *see*

*also* Amicus's Reply Supporting Motion To Seal Briefs And Appendices Filed In

This Appeal 6, D.C. Cir. Item #1603484 (citing other federal appellate opinions

supporting sealing of medical information in disability and other cases).

Accordingly, if this Court were to find the Hardaways' allegations

insufficient to establish Article III jurisdiction, the appropriate course would be to

reverse the dismissal and remand for the Hardaways to have an opportunity to

amend their pleadings subject to an order sealing Angelene's medical information

and medical records.  At a minimum, even absent reversal of the dismissal order,

this Court should reverse the sealing motion's denial and order sealing.

## CONCLUSION

For the foregoing reasons, Amicus respectfully requests that this Court

reverse the district court's dismissal and sealing denial orders, and remand this

case for further proceedings subject to the sealing of all documents containing

Angelene's medical information or medical records.

### REQUEST FOR ORAL ARGUMENT

Amicus respectfully requests oral argument for the issues raised in this brief.


Dated:  May 20, 2016                    Respectfully submitted,


                                        /s/ Dina B. Mishra
                                        DINA B. MISHRA
                                        *Counsel of Record and*
                                        *Court-Appointed Amicus Curiae*
                                        *in Support of Plaintiffs-Appellants*

                                        STEVEN H. GOLDBLATT, Director
                                        SARAH MCDONOUGH, Student Counsel

                                        GEORGETOWN UNIVERSITY LAW CENTER
                                        APPELLATE LITIGATION PROGRAM
                                        111 F Street NW, Suite 306
                                        Washington, DC 20001
                                        (202) 662-9788

61

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C)(i), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and D.C. Circuit Rule 28(c).

1.     Excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1), the brief contains 13,763 words.

2.     Pursuant to Federal Rule of Appellate Procedure 32(a)(5)(A), (6), the brief has been prepared in proportionally spaced roman typeface using Microsoft Word for Macintosh 2011 in 14-point Times New Roman font, with italics for emphasis and case names.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), I have relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  May 20, 2016                    /s/ Dina B. Mishra
                                        DINA B. MISHRA
                                        *Court-Appointed Amicus Curiae*
                                        *in Support of Plaintiffs-Appellants*

62

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of May, 2016, I filed the foregoing Opening Brief of Appointed Amicus Curiae in Support of Plaintiffs-Appellants with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by electronically filing the public version through the Appellate CM/ECF Filer system and by causing 7 (6 plus original) paper copies of the sealed/locked version and 9 (8 plus original) paper copies of the public version to be hand-delivered to the Office of the Clerk of the Court. I also hereby certify that on this 20th day of May, 2016, I caused 2 copies of the sealed/locked version and 2 copies of the public version of the foregoing brief to be sent, by Federal Express overnight delivery, to each of the following:

Alex M. Chintella, Frederick Arnold Douglas, & Curtis A. Boykin
DOUGLAS & BOYKIN PLLC
1850 M Street, NW, Suite 640
Washington DC 20036-2365
*Counsel for Defendant-Appellee*

Nicola Grey & Mashanda Y. Moseley
DISTRICT OF COLUMBIA HOUSING AUTHORITY
OFFICE OF THE GENERAL COUNSEL
1133 North Capitol Street, NE, Suite 210
Washington DC 20002
*Counsel for Defendant-Appellee*

Lena Hardaway & Angelene Hardaway
3232 Georgia Avenue, NW
Apartment 605
Washington, DC 20010
*Plaintiffs-Appellants*

Dated: May 20, 2016

/s/ Dina B. Mishra
DINA B. MISHRA
*Court-Appointed Amicus Curiae*
*in Support of Plaintiffs-Appellants*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

Fair Housing Act, 42 U.S.C. § 3604(f)..................................................................... A-2

Americans with Disabilities Act, 42 U.S.C. § 12132 .......................................... A-2

Americans with Disabilities Act, 42 U.S.C. § 12131(2) ..................................... A-2

Rehabilitation Act, 29 U.S.C. § 794(a) ................................................................. A-3

Housing Choice Voucher Program statute, 42 U.S.C. § 1437f(o), (r) ................. A-3

24 C.F.R. § 982.1................................................................................................... A-5

24 C.F.R. § 982.201(a), (b) .................................................................................. A-5

24 C.F.R. § 982.316(a) .......................................................................................... A-6

24 C.F.R. § 982.355(a), (b), (c)(12), (d), (e) ........................................................ A-7

24 C.F.R. § 982.402(a), (b)(1), (b)(6)-(8), (d)...................................................... A-8

24 C.F.R. § 982.505(a)-(b), (d) ............................................................................ A-9

24 C.F.R. § 982.515................................................................................................ A-9

24 C.F.R. § 982.551(h)(2), (4).............................................................................. A-10

24 C.F.R. § 5.403.................................................................................................. A-10

24 C.F.R. § 5.628(a) ............................................................................................. A-11

D.C. Code § 6-202(a), (b)..................................................................................... A-11

D.C. Mun. Regs. tit. 14, § 4900............................................................................ A-12

D.C. Mun. Regs. tit. 14, § 5205.1, .2(e), (g), .3(e) .............................................. A-13

D.C. Mun. Regs. tit. 14, § 5206............................................................................ A-13

D.C. Mun. Regs. tit. 14, § 8300.2(e) (2013)........................................................ A-14

**Fair Housing Act, 42 U.S.C. § 3604(f)**

As made applicable by section 3603 of this title and except as exempted by section 3603(b) and 3607 of this title, it shall be unlawful--

…

(f)    (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of--

      (A) that buyer or renter,

      (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

      (C) any person associated with that buyer or renter.

    (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of--

      (A) that person; or

      (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

      (C) any person associated with that person.

    (3) For purposes of this subsection, discrimination includes--

      …

      (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling; …

      …

**Americans with Disabilities Act, 42 U.S.C. § 12132**

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

**Americans with Disabilities Act, 42 U.S.C. § 12131(2)**

As used in this subchapter:

(2) Qualified individual with a disability

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

## Rehabilitation Act, 29 U.S.C. § 794(a)

(a) Promulgation of rules and regulations
   No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ….

## Housing Choice Voucher Program statute, 42 U.S.C. § 1437f(o), (r)

(o) Voucher program
   (1) Authority
      (A) In general
         The Secretary may provide assistance to public housing agencies for tenant-based assistance using a payment standard established in accordance with subparagraph (B). The payment standard shall be used to determine the monthly assistance that may be paid for any family, as provided in paragraph (2).
      (B) Establishment of payment standard
         Except as provided under subparagraph (D), the payment standard for each size of dwelling unit in a market area shall not exceed 110 percent of the fair market rental established under subsection (c) of this section for the same size of dwelling unit in the same market area and shall be not less than 90 percent of that fair market rental.
         …
      (D) Approval
         The Secretary may require a public housing agency to submit the payment standard of the public housing agency to the Secretary for approval, if the payment standard is less than 90 percent of the fair market rental or exceeds 110 percent of the fair market rental.

…

(2) Amount of monthly assistance payment

Subject to the requirement under section 1437a(a)(3) of this title (relating to minimum rental amount), the monthly assistance payment for a family receiving assistance under this subsection shall be determined as follows:

…

(B) Tenant-based assistance; rent exceeding payment standard

For a family receiving tenant-based assistance, if the rent for the family (including the amount allowed for tenant-paid utilities) exceeds the applicable payment standard established under paragraph (1), the monthly assistance payment for the family shall be equal to the amount by which the applicable payment standard exceeds the greatest of amounts under clauses (i), (ii), and (iii) of subparagraph (A).

…

(3) 40 percent limit

At the time a family initially receives tenant-based assistance under this section with respect to any dwelling unit, the total amount that a family may be required to pay for rent may not exceed 40 percent of the monthly adjusted income of the family.

…

(10) Rent

(A) Reasonableness

The rent for dwelling units for which a housing assistance payment contract is established under this subsection shall be reasonable in comparison with rents charged for comparable dwelling units in the private, unassisted local market.

…

…

(r) Portability

(1) In general.--(A) Any family receiving tenant-based assistance under subsection (o) of this section may receive such assistance to rent an eligible dwelling unit if the dwelling unit to which the family moves is within any area in which a program is being administered under this section.

…

(2) The public housing agency having authority with respect to the dwelling unit to which a family moves under this subsection shall have the responsibility of carrying out the provisions of this subsection with respect to the family.

…

A-4

**24 C.F.R. § 982.1**

Programs: purpose and structure.

(a) General description.

    (1) In the HUD Housing Choice Voucher (HCV) program, HUD pays rental subsidies so eligible families can afford decent, safe, and sanitary housing. The HCV program is generally administered by State or local governmental entities called public housing agencies (PHAs). HUD provides housing assistance funds to the PHA. HUD also provides funds for PHA administration of the program.

    (2) Families select and rent units that meet program housing quality standards. If the PHA approves a family's unit and tenancy, the PHA contracts with the owner to make rent subsidy payments on behalf of the family. A PHA may not approve a tenancy unless the rent is reasonable.

    (3) Subsidy in the HCV program is based on a local "payment standard" that reflects the cost to lease a unit in the local housing market. If the rent is less than the payment standard, the family generally pays 30 percent of adjusted monthly income for rent. If the rent is more than the payment standard, the family pays a larger share of the rent.

(b) Tenant-based and project-based assistance.

    (1) Section 8 assistance may be "tenant-based" or "project-based". … With tenant-based assistance, the assisted unit is selected by the family. The family may rent a unit anywhere in the United States in the jurisdiction of a PHA that runs a voucher program.

    (2) To receive tenant-based assistance, the family selects a suitable unit. After approving the tenancy, the PHA enters into a contract to make rental subsidy payments to the owner to subsidize occupancy by the family. The PHA contract with the owner only covers a single unit and a specific assisted family. If the family moves out of the leased unit, the contract with the owner terminates. The family may move to another unit with continued assistance so long as the family is complying with program requirements.

**24 C.F.R. § 982.201(a), (b)**

Eligibility and targeting.

(a) When applicant is eligible: In general. The PHA may admit only eligible families to the program. To be eligible, an applicant must be a "family;" must be income-eligible in accordance with paragraph (b) of this section and 24 CFR part

A-5

5, subpart F; and must be a citizen or a noncitizen who has eligible immigration status as determined in accordance with 24 CFR part 5, subpart E. …

(b) Income—

    (1) Income-eligibility. To be income-eligible, the applicant must be a family in any of the following categories:

    (i) A "very low income" family;

    (ii) A low-income family that is "continuously assisted" under the 1937 Housing Act;

    (iii) A low-income family that meets additional eligibility criteria specified in the PHA administrative plan. Such additional PHA criteria must be consistent with the PHA plan and with the consolidated plans for local governments in the PHA jurisdiction;

    (iv) A low-income family that qualifies for voucher assistance as a non-purchasing family residing in a HOPE 1 (HOPE for public housing homeownership) or HOPE 2 (HOPE for homeownership of multifamily units) project. (Section 8(o)(4)(D) of the 1937 Act (42 U.S.C. 1437f(o)(4)(D));

    (v) A low-income or moderate-income family that is displaced as a result of the prepayment of the mortgage or voluntary termination of an insurance contract on eligible low-income housing as defined in § 248.101 of this title;

    (vi) A low-income family that qualifies for voucher assistance as a non-purchasing family residing in a project subject to a resident homeownership program under §248.173 of this title.

…

## 24 C.F.R. § 982.316(a)

Live-in aide

(a) A family that consists of one or more elderly, near-elderly or disabled persons may request that the PHA approve a live-in aide to reside in the unit and provide necessary supportive services for a family member who is a person with disabilities. The PHA must approve a live-in aide if needed as a reasonable accommodation in accordance with 24 CFR part 8 to make the program accessible to and usable by the family member with a disability. …

**24 C.F.R. § 982.355(a), (b), (c)(12), (d), (e)**

Portability: Administration by initial and receiving PHA

(a) General. When a family moves under portability (in accordance with § 982.353(b)) to an area outside the initial PHA jurisdiction, the receiving PHA must administer assistance for the family if a PHA with a HCV program has jurisdiction in the area where the unit is located.

(b) Requirement to administer assistance. A receiving PHA cannot refuse to assist incoming portable families or direct them to another neighboring PHA for assistance. …

(c) Portability procedures. The following portability procedures must be followed: …

    (12) The receiving PHA must determine the family unit size for the family, and base its determination on the subsidy standards of the receiving PHA.

…

(d) Absorption by the receiving PHA.

    (1) If funding is available under the consolidated ACC for the receiving PHA's HCV program, the receiving PHA may absorb the family into the receiving PHA's HCV program. After absorption, the family is assisted with funds available under the consolidated ACC for the receiving PHA's HCV program.

…

(e) Portability billing.

    (1) To cover assistance for a portable family that was not absorbed in accordance with paragraph (d) of this section, the receiving PHA may bill the initial PHA for housing assistance payments and administrative fees.

    (2) The initial PHA must promptly reimburse the receiving PHA for the full amount of the housing assistance payments made by the receiving PHA for the portable family. The amount of the housing assistance payment for a portable family in the receiving PHA program is determined in the same manner as for other families in the receiving PHA program.

…

**24 C.F.R. § 982.402(a), (b)(1), (b)(6)-(8), (d)**

Subsidy standards

(a) Purpose.
   (1) The PHA must establish subsidy standards that determine the number of bedrooms needed for families of different sizes and compositions.
   (2) For each family, the PHA determines the appropriate number of bedrooms under the PHA subsidy standards (family unit size).
   (3) The family unit size number is entered on the voucher issued to the family. The PHA issues the family a voucher for the family unit size when a family is selected for participation in the program.
(b) Determining family unit size. The following requirements apply when the PHA determines family unit size under the PHA subsidy standards:
   (1) The subsidy standards must provide for the smallest number of bedrooms needed to house a family without overcrowding.
   …
   (6) Any live-in aide (approved by the PHA to reside in the unit to care for a family member who is disabled or is at least 50 years of age) must be counted in determining the family unit size;
   (7) Unless a live-in-aide resides with the family, the family unit size for any family consisting of a single person must be either a zero or one-bedroom unit, as determined under the PHA subsidy standards.
   (8) In determining family unit size for a particular family, the PHA may grant an exception to its established subsidy standards if the PHA determines that the exception is justified by the age, sex, health, handicap, or relationship of family members or other personal circumstances. (For a single person other than a disabled or elderly person or remaining family member, such PHA exception may not override the limitation in paragraph (b)(7) of this section.)
   …
(d) Size of unit occupied by family.
   (1) The family may lease an otherwise acceptable dwelling unit with fewer bedrooms than the family unit size. However, the dwelling unit must meet the applicable HQS space requirements.
   (2) The family may lease an otherwise acceptable dwelling unit with more bedrooms than the family unit size.

A-8

**24 C.F.R. § 982.505(a)-(b), (d)**

How to calculate housing assistance payment

(a) Use of payment standard. A payment standard is used to calculate the monthly housing assistance payment for a family. The "payment standard" is the maximum monthly subsidy payment.

(b) Amount of monthly housing assistance payment. The PHA shall pay a monthly housing assistance payment on behalf of the family that is equal to the lower of:

    (1) The payment standard for the family minus the total tenant payment; or

    (2) The gross rent minus the total tenant payment.

…

(d) PHA approval of higher payment standard for the family as a reasonable accommodation. If the family includes a person with disabilities and requires a higher payment standard for the family, as a reasonable accommodation for such person, in accordance with part 8 of this title, the PHA may establish a higher payment standard for the family within the basic range.


**24 C.F.R. § 982.515**

Family share: Family responsibility

(a) The family share is calculated by subtracting the amount of the housing assistance payment from the gross rent.

(b) The family rent to owner is calculated by subtracting the amount of the housing assistance payment to the owner from the rent to owner.

(c) The PHA may not use housing assistance payments or other program funds (including any administrative fee reserve) to pay any part of the family share, including the family rent to owner. Payment of the whole family share is the responsibility of the family.

**24 C.F.R. § 982.551(h)(2), (4)**

Obligations of participant

(h) Use and occupancy of unit.—

…

(2) The composition of the assisted family residing in the unit must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. The family must request PHA approval to add any other family member as an occupant of the unit. No other person [i.e., nobody but members of the assisted family] may reside in the unit (except for a foster child or live-in aide as provided in paragraph (h)(4) of this section).

…

(4) If the PHA has given approval, a foster child or a live-in-aide may reside in the unit. The PHA has the discretion to adopt reasonable policies concerning residence by a foster child or a live-in-aide, and defining when PHA consent may be given or denied.

…

**24 C.F.R. § 5.403**

Definitions

…

Family includes, but is not limited to, the following, regardless of actual or perceived sexual orientation, gender identity, or marital status:

    (1) A single person, who may be an elderly person, displaced person, disabled person, near-elderly person, or any other single person; or

    (2) A group of persons residing together, and such group includes, but is not limited to:

    (i) A family with or without children (a child who is temporarily away from the home because of placement in foster care is considered a member of the family);

    (ii) An elderly family;

    (iii) A near-elderly family;

    (iv) A disabled family;

    (v) A displaced family; and

    (vi) The remaining member of a tenant family.

A-10

Live-in aide means a person who resides with one or more elderly persons, or near-elderly persons, or persons with disabilities, and who:
  (1) Is determined to be essential to the care and well-being of the persons;
  (2) Is not obligated for the support of the persons; and
  (3) Would not be living in the unit except to provide the necessary supportive services.
…


### 24 C.F.R. § 5.628(a)

Total tenant payment

(a) Determining total tenant payment (TTP). Total tenant payment is the highest of the following amounts, rounded to the nearest dollar:
  (1) 30 percent of the family's monthly adjusted income;
  (2) 10 percent of the family's monthly income;
  (3) If the family is receiving payments for welfare assistance from a public agency and a part of those payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of those payments which is so designated; or
  (4) The minimum rent, as determined in accordance with § 5.630.


### D.C. Code § 6-202(a), (b)

Establishment of District of Columbia Housing Authority; purposes of Authority; Fund

(a) There is established, as an independent authority of the District government, the District of Columbia Housing Authority. The Authority shall be a corporate body, intended, created, and empowered to effectuate the purposes stated in this chapter, and shall have a legal existence separate from the District government. The Authority shall be the successor in interest to the housing authority created by subchapter II of Chapter 2 of Title 6. All real and personal property, assets, records, and obligations, and all unexpended balances of appropriations, allocations, and other funds available or to be made available relating to the powers, duties, functions, operations, and administration of the DPAH and of the authority created under subchapter II of Chapter 2 of Title 6 shall become the property of the Authority on May 9, 2000, without further action.

(b) The Authority shall govern public housing and implement the Housing Act of 1937 in the District, and shall be responsible for providing decent, safe, and sanitary dwellings, and related facilities, for persons and families of low-and moderate-income in the District.

**D.C. Mun. Regs. tit. 14, § 4900**

STATEMENT OF POLICIES AND OBJECTIVES

4900.1 The Section 8 Program was established by the Housing and Community Development Act of 1974, 42 U.S.C. § 1437 (1976), and amended by the Housing and Community Development Act of 1981 (Pub. L. 97-35), the Housing and Urban-Rural Recovery Act of 1983 (Pub. L. 98-181), the Technical Amendments Act of 1984 (Pub. L. 98-479), and the Housing and Community Development Act of 1987 (42 U.S.C. § 3543).

4900.2 Administration of the Housing Program and the functions and responsibilities of the District of Columbia Housing Authority (DCHA) shall be in compliance with the personnel policy of DCHA, the Equal Opportunity Plan, and the Department of Housing and Urban Development's (HUD) Housing Choice Voucher Procedures Manual.

4900.3 Administration of the Housing Choice Voucher Program (HCVP) shall be consistent with all federal, state, and local laws, including but not limited to:

(a) Fair Housing Act (42 U.S.C. §§ 3601, et seq.);

(b) Federal and D.C. Fair Housing regulations;

(c) D.C. Human Rights Act (D.C. Official Code §§ 2-1401.01, et seq. (2011 Supp.));

(d) American with Disabilities Act (ADA) (42 U.S.C §§ 12101, et seq.);

(e) Violence Against Women Act (VAWA) (42 U.S.C. § 13981); and

(f) Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §§ 701, et seq.).

A-12

**D.C. Mun. Regs. tit. 14, § 5205.1, .2(e), (g), .3(e)**

DETERMINATION OF VOUCHER SIZE

5205.1 The Voucher size is used to determine the maximum rent subsidy for a Family assisted in the HCVP.

5205.2 The following requirements apply when DCHA determines Voucher size under the subsidy standards:

> …
>
> (e) A live-in aide, approved by DCHA, shall be counted in determining the Voucher size;
>
> …
>
> (g) The Voucher size for any Family consisting of a single person shall only be a one (1)-bedroom.

5205.3 DCHA shall assign one (1)-bedroom for the Head of Household and/or a Spouse and an additional bedroom for each two (2) persons within the household with the following exceptions:

> …
>
> (e) A live-in aide approved by DCHA shall be allocated an individual bedroom.

…


**D.C. Mun. Regs. tit. 14, § 5206**

EXCEPTIONS TO VOUCHER SIZE

5206.1 In determining the Voucher size for a particular Family, DCHA may grant an exception to the subsidy standards set forth in § 5205 if DCHA determines that the exception is justified by the age, sex, gender identity, health, or disability of one (1) or more of the Family members.

5206.2 For a single person who is not elderly, disabled, or a remaining Family member as explained in § 5317.8, an exception cannot override the regulatory limit of a one (1) bedroom unit.

> …

A-13

**D.C. Mun. Regs. tit. 14, § 8300.2(e) (2013)**

8300.2 Payment Standard

…

(e) The Payment Standard is 110% of the Fair Market Rents for all size units in all areas of the District of Columbia. Any change to the Payment Standard shall be implemented by regulatory action of the Commission and shall apply to all vouchers issued after the date of the adoption of any regulation modifying the Payment Standard.